**OFFICE OF COMMUNICATION OF the UNITED CHURCH OF CHRIST, Petitioner,**

v.

**FEDERAL COMMUNICATIONS COMMISSION and United States of America, Respondents,**

**CBS, Inc., National Association of Broadcasters, Radio Station Licensees, Ameri-** can Broadcasting Companies, Inc., National Radio Broadcasters Association, Mutual Broadcasting System, Inc., Black Citizens for Fair Media, Action for Children's Television, National Organization for Women, Empowerment Through Communications, Citizens Committee on the Media, Tribune Company, National Organization for Women—New York Chapter, National Organization for Women—Essex County, New Jersey Chapter, Office of Communication of the Episcopal Church, WNCN Listeners Guild, Inc., Episcopal Radio-Television Foundation, Department of Communication of the United States Catholic Conference, and Communications Commission of the National Council of Churches, Intervenors.

**CLASSICAL RADIO FOR CONNECTICUT, INC., Petitioner,**

v.

**FEDERAL COMMUNICATIONS COMMISSION and United States of America, Respondents,**

National Citizens Committee for Broadcasting, National Association of Broadcasters, and American Legal Foundation, Intervenors.

Henry GELLER, Petitioner,

v.

FEDERAL COMMUNICATIONS COM-
MISSION and United States of
America, Respondents,

CBS, Inc., American Broadcasting Com-
panies, Inc. and National Association
of Broadcasters, Intervenors.

NATIONAL ASSOCIATION FOR the
ADVANCEMENT OF COLORED
PEOPLE et al., Petitioners,

v.

FEDERAL COMMUNICATIONS COM-
MISSION and United States of
America, Respondents,

American Broadcasting Companies, Inc.
and National Association of
Broadcasters, Intervenors.

Nos. 81–1032, 81–1463, 81–2127
and 81–2134.

United States Court of Appeals,
District of Columbia Circuit.

Argued May 24, 1982.

Decided May 10, 1983.

Earle K. Moore, New York City, with whom Donna A. Demac and David M. Rice, New York City, were on the brief, for petitioner Office of Communication of the United Church of Christ. Andrew Jay Schwartzman and Heidi P. Sanchez, New York City, entered appearances for petitioner Office of Communication of the United Church of Christ.

Michael Botein, New York City, entered an appearance for petitioner Classical Radio for Connecticut, Inc.

Henry Geller, pro se, with whom Ira Barron, Claremont, Cal., was on the brief, for petitioner Henry Geller.

Wilhelmina Reuben Cooke, Jeffrey H. Olson, and Angela J. Campbell, Washington, D.C., were on the brief for petitioners N.A.A.C.P. et al.

Daniel M. Armstrong, Associate Gen. Counsel, F.C.C., Washington, D.C., with whom Jane E. Mago, Michael Deuel Sullivan, C. Grey Pash, Jr., and Gregory M. Christopher, Counsel, F.C.C., Washington, D.C., were on the brief, for respondents. Lisa B. Margolis, Counsel, F.C.C., Washington, D.C., entered an appearance for respondent F.C.C. Barry Grossman and James H. Laskey, Attys., Dept. of Justice, Washington, D.C., entered appearances for respondent United States of America.

Timothy B. Dyk, Washington, D.C., with whom J. Roger Wollenberg and Bruce D. Ryan, Washington, D.C. (for CBS, Inc.), James A. McKenna, Jr., Carl R. Ramey, Washington, D.C., and Douglas S. Land, New York City (for American Broadcasting Companies, Inc.), Bruce D. Goodman and Ilene R. Price, Arlington, Va. (for Mutual Broadcasting System, Inc.), Erwin G. Krasnow and Barry D. Umansky, Washington, D.C. (for National Ass'n of Broadcasters), Thomas Schattenfield, Washington, D.C. (for National Radio Broadcasters Ass'n), and Robert A. Beizer, Washington, D.C. (for Tribune Co.) were on the joint brief, for intervenors CBS, Inc. et al. Robert W. Coll, Washington, D.C., entered an appearance for intervenor American Broadcasting Companies, Inc. Susan A. Marshall, Washington, D.C., entered an appearance for intervenor National Radio Broadcasters Ass'n.

Richard A. Helmick, Washington, D.C., entered an appearance for intervenor Mutual Broadcasting System, Inc. Steven M. Harris, Washington, D.C., entered an appearance for intervenor Tribune Co.

Charles M. Firestone, Los Angeles, Cal., was on the brief for intervenors National Citizens Committee for Broadcasting et al.

Donna A. Demac, New York City, was on the statement in lieu of brief for intervenors Communications Commission of the National Council of Churches et al.

Franklin K. Moss, New York City, entered an appearance for intervenor WNCN Listeners Guild, Inc.

Robert W. Coll and Carl R. Ramey, Washington, D.C., entered appearances for intervenor Radio Station Licensees.

Daniel J. Popeo, Utica, N.Y., entered an appearance for intervenor American Legal Foundation.

William H. Mellor, III, Denver, Colo., was on the brief for amici curiae Mountain States Legal Foundation et al., urging affirmance.

John M. Cutler, Chicago, Ill., and David Crump, Raleigh, N.C., were on the brief for amicus curiae Legal Foundation of America, urging affirmance.

Andrew Jay Schwartzman, New York City, was on the brief for amicus curiae Public Media Center, urging reversal and remand.

Before WRIGHT and BORK, Circuit Judges, and JAMESON,* Senior District Judge.

Opinion for the court filed by Circuit Judge J. SKELLY WRIGHT.

Concurring statement filed by Circuit Judge BORK.

---

* Of the United States District Court for the District of Montana, sitting by designation pursuant to 28 U.S.C. § 294(d) (Supp. V 1981).

1. Between 1972 and 1979 the Commission had already reviewed and then modified or eliminated over 800 technical broadcast rules. Since 1978 the Commission's staff had been investi-

**J. SKELLY WRIGHT, Circuit Judge:**

In these consolidated petitions for review we are asked to decide whether the Federal Communications Commission may, consistent with its statutory obligations, undertake a sweeping deregulation of the commercial radio industry. The Commission's deregulation orders culminate a three-year, extensive inquiry into the continued value and efficacy of the existing radio regulatory scheme in light of structural changes in the industry and a renewed determination to eliminate unnecessary regulation. The repudiation in this one rulemaking proceeding of so many long-standing policies and rules necessitates close judicial scrutiny to ensure that the Commission has remained faithful to the pertinent directives of both the Communications Act and the Administrative Procedure Act. For the reasons detailed below and with several serious reservations, we uphold most of the actions taken by the Commission. We remand only those portions of the Commission's orders that eliminate the requirement of programming logs. On remand we direct the Commission to reconsider its decision, this time giving adequate attention to the usefulness of programming logs in the newly-revised, overall scheme of broadcast regulation.

## I. BACKGROUND

### A. *Procedural History*

On September 6, 1979 the Commission instituted rule-making proceedings to consider far-ranging proposals for rule and policy changes that would effect a substantial deregulation of commercial broadcast radio.[1] In its *Notice of Inquiry and Proposed Rulemaking, Deregulation of Radio,* 733 FCC2d 457 (1979) (*Notice*) (Joint Appendix (JA) 195), the Commission identified as its

gating the operations for more substantive deregulation. Also that year the National Association of Broadcasters filed a petition for rulemaking seeking elimination of precisely those regulations the Commission was to focus on in its 1979–81 proceedings. *See Notice,* 73 FCC2d at 458 & n. 2A, JA 196.

goal the "potential reduction or elimination of regulations no longer appropriate to certain marketplace conditions and whose elimination would be consistent with the Commission's public interest obligations." *Id.* at 458, JA 196. The *Notice* provided a detailed economic analysis of the current conditions in the radio industry, concluding that increased competition and diversity among radio stations necessitated a reevaluation of the Commission's entire regulatory approach. The Commission identified four areas in which significant deregulatory steps might be appropriate: (1) the guidelines encouraging radio licensees to present certain amounts of nonentertainment programming to meet the needs and problems of their communities; (2) the ascertainment procedures by which .the licensees must identify those community needs and problems; (3) the guidelines that serve to limit the amount of radio broadcast time devoted to commercials; and (4) the requirement that radio stations maintain and make available program logs that record information about each program or commercial aired during the broadcast day.[2] After setting forth a number of alternative options in each area of regulation, the *Notice* concluded by indicating the Commission's initial preferences and by soliciting both comments and empirical information from interested parties. *See Notice,* 73 FCC2d at 525–528, JA 263–266.

Public response was swift and vociferous; the Commission received over 20,000 comments and over 2,000 reply comments.[3] The majority of the comments predominantly opposed deregulation. *Report and Order, Deregulation of Radio,* 84 FCC2d 968, 972 (1981) (*Report and Order*) (JA 31, 35). The American Civil Liberties Union and other public interest groups filed a motion for rescission of the *Notice* and for

other procedural relief, protesting the limited comment period, the unclear scope of the *Notice,* and the lack of adequate evidentiary support. The Commission largely denied the request, but did release additional data and explanatory materials.[4] On January 14, 1981 the Commission adopted its *Report and Order,* taking the following actions in the four areas of regulation:

(1) eliminating quantitative guidelines for nonentertainment programming and retaining a modified and more limited obligation to provide such programming;

(2) eliminating formal ascertainment procedures;

(3) eliminating quantitative guidelines for commercial time; and

(4) eliminating program logs requirements.

The *Report and Order* provided extensive discussion of each decision, including, in the Appendices, separate explanations of the history of Commission policy and the major issues raised by the filed comments for each subject area.

Subsequently, the Commission received numerous petitions for reconsideration, all of which were denied. However, the Commission did adopt another order on July 30, 1981 which discussed the issues raised by the petitions and attempted to clarify selected aspects of the original decision. *See Memorandum Opinion and Order,* 87 FCC2d 797 (1981) (*Reconsideration Order*) (JA 1). Prior to the release of the *Reconsideration Order,* the Office of Communication of the United Church of Christ (UCC) and Classical Radio for Connecticut, Inc. (CRC) filed petitions for review with this court. The other petitioners, Henry Geller and the group of organizations identified as the National Association for the Advancement of Colored People, *et al.,* filed their petitions

---

**2.** For more detailed descriptions of each area of regulation, see the general discussion *infra* at pp. 1420–1422.

**3.** In addition, panel discussions and public participation workshops were conducted in various cities nationwide, thereby alerting the public to the proceedings and enabling radio stations, organizations, and government agencies

to discuss the deregulation proposals directly with Commission staff members. *Report and Order,* 84 FCC2d at 974–975, JA 37–38.

**4.** *Release of Additional Material in Radio Deregulation Proceeding,* BC Docket No. 79–219, Report No. 15448 (Jan. 11, 1980).

subsequently. All petitions were consolidated by this court.[5]

### B. *The Commission's Decision*

The basic premise underlying the Commission's decision to deregulate is the belief that current conditions in the radio marketplace permit the Commission to reduce direct government control of licensees while still remaining faithful to its statutory mandate to regulate in the public interest.[6] The Commission's *Notice* provided a detailed examination of the radio market, focusing upon two significant changes in the structure of the industry: (1) the substantial increase in the number of radio stations, and hence in the competition among stations;[7] and (2) the transformation of radio into a secondary, and more specialized, source of entertainment and information.[8] The *Notice* developed an "economic policy model" in which the competitive forces of this new marketplace are presented as far more responsive to the wants and needs of the listening audience than are the government regulators with their limited supplies of information and financial resources. Under such a theory, continued government intervention would unduly restrict the flexibility of radio stations to respond to audience interests and, except in unusual cases of market failure, would therefore be inconsistent with providing the best service to the public. *See Notice,* 73 FCC2d at 491–497, JA 229–235.

However, the Commission ultimately rejected this strict market approach. In its final decision the Commission concluded that near-total reliance on market forces could result in too little nonentertainment programming, could create significant administrative difficulties, and, most importantly, could be construed as contrary to the Communications Act's requirement that *each individual station* be found to serve the public interest. *See Report and Order,* 84 FCC2d at 1022, 1071, JA 85, 134. Instead, the Commission adopted more selective deregulatory steps, all of which rely upon retention of a "bedrock obligation"— that each radio station must "discuss issues of concern to its community of license." *Id.* at 977–982, JA 40–45.

Within the context of this reaffirmation of a licensee's public interest responsibility, the Commission eliminated or modified many of its regulatory policies and procedures. First, the Commission eliminated its quantitative processing guidelines for nonentertainment programming. In effect since 1973, these guidelines provided that AM radio stations proposing to offer less than eight percent nonentertainment programming and FM stations proposing less than six percent cannot have their applications routinely processed by the Broadcast Bureau that operates under a delegation of authority from the Commission. Instead, the Bureau staff must bring those applications to the attention of the full Commission. These guidelines therefore served,

**5.** This court has jurisdiction over the cases pursuant to 47 U.S.C. § 402(a) (1976) and 28 U.S.C. §§ 1343, 1344 (1976) as the petitioners' interests have been adversely affected by the Commission's orders here on review.

**6.** The "public interest" standard of the Communications Act, 47 U.S.C. § 151 *et seq.* (1976 & Supp. IV 1980), is embodied in those provisions which require the Commission to carry out its various statutory responsibilities so as to serve the "public convenience, interest, or necessity." *See, e.g.,* 47 U.S.C. §§ 303, 307(d), 309(a), 310(d) (1976). For more extensive discussion of the public interest standard, *see* text at pp. 1423–1424 *infra.*

**7.** In 1934, when the Communications Act was first adopted, there were 583 AM stations and no FM stations. By 1979, there were 4,547 AM

and 4,107 FM stations in operation, reflecting both the extension of radio service into the previously unserved rural areas and the increase in the number of stations serving the urban markets. *See Notice,* 73 FCC2d at 484–486, JA 222–224.

**8.** With the advent and growth of television as a competing and now dominant entertainment and informational medium, radio has become increasingly specialized, in terms of both formats and audience. For example, data collected in 1979 showed that 118 stations offered all-news formats and that 416 stations provided some regularly scheduled Black-oriented programming. *See generally Notice,* 73 FCC2d at 486–490, JA 224–228.

not as an absolute bar to stations seeking to offer less nonentertainment programming, but as a means by which the Commission could "flag" those applications that might raise problems worthy of full Commission consideration. *See id.* at 975, JA 38.

The Commission also substantially redefined its understanding of how radio licensees could meet their public interest obligation to provide nonentertainment programming. Until this proceeding, broadcasters followed the Commission's landmark *Report and Statement of Policy Res: Commission en banc Programming Inquiry,* 44 FCC 2303 (1960) (*Programming Statement*). This statement of programming policy stressed the need for "well-rounded community service"[9] and went on to describe Commission expectations of each station's program service.

The major elements usually necessary to meet the public interest, needs and desires of the community in which the station is located as developed by the industry, and recognized by the Commission, have included: (1) opportunity for local self-expression, (2) the development and use of local talent, (3) programs for children, (4) religious programs, (5) educational programs, (6) public affairs programs, (7) editorialization by licensees, (8) political broadcasts, (9) agricultural programs, (10) news programs[,] (11) weather and market reports, (12) sports programs, (13) service to minority groups, (14) entertainment programs.[10]

In its *Report and Order* the Commission now defined the public interest to require only that radio licensees provide programming responsive to community issues. *See Reconsideration Order,* 87 FCC2d at 804, JA 8. Broadcasters need not then, as a Commission requirement, provide any specific *types* of programming such as those listed above. Furthermore, in selecting which community issues to cover, licensees "may take into account their listenership and its interests, and the services provided by other radio stations in the community to groups other than its own listenership." *Report and Order,* 84 FCC2d at 978, JA 41. In other words, the Commission will no longer require licensees to be responsive to issues facing the entire community or facing every significant group in the community; instead, the broadcasters may focus on the needs of their own audiences if they can show that other stations are providing adequate service for the other groups.

Second, the Commission eliminated its formal ascertainment procedures. Over the years, the Commission had developed detailed procedures for licensees to follow in order to determine the needs and interests of the communities served and so to provide responsive programming. The requirements included compiling demographic data, conducting public opinion polls, interviewing community leaders, and developing lists of problems and issues facing the community. *See Primer on Ascertainment of Community Problems by Broadcast Applicants,* 27 FCC2d 650 (1971) (*Ascertainment Primer*). In its decision the Commission eliminated all procedural ascertainment requirements, imposing on licensees only the generalized obligation to determine the major issues in the communities of license that would warrant responsive programming. The broadcasters may use "any reasonable means" to ascertain the needs and problems of the community. *See Report and Order,* 84 FCC2d at 993, JA 56.

Third, the Commission eliminated its commercialization processing guidelines. Like the nonentertainment programming guidelines, these served only to flag applications that warranted full Commission review. If a licensee proposed more advertising time than suggested by the appropriate guideline—generally 18 minutes of commercials per hour—then the application could not be processed routinely by the Broadcast Bureau. The Commission decided to eliminate all rules and policies relating to its concern of over-commercialization. Instead, the Commission intends to rely on marketplace forces entirely to determine

---

**9.** *Programming Statement,* 44 FCC at 2315.

**10.** *Id.* at 2314.

commercialization levels and to deter advertising abuse. *Id.* at 999–1008, JA 62–71.

Finally, the Commission eliminated the requirement of programming logs. The rules provided a uniform method for recording information on the name and category of program (such as "music" or "news"), the source of the program (such as "network" or "local"), and the time the program aired. *Id.* at 1111, JA 174. The Commission noted that the stations would still have to maintain public inspection files that "will provide considerable information of value to citizens making public interest programming inquiries of licensees." *Id.* at 1010, JA 73. In particular, the file would contain an annual "issues/programs list," enumerating from five to ten issues of concern to the community, and providing examples of the programs presented in efforts to address those issues. *Id.* at 999, JA 62. This issues/programs list will henceforth be the only record of programming available in a station's public file. *Id.* at 971, JA 34.

## II. SCOPE OF REVIEW

Petitioners challenge virtually every aspect of the Commission's decision as violating either the substantive mandate of the Communications Act (Act) or the applicable requirements of the Administrative Procedure Act (APA). Before reaching the merits of these contentions, we pause to clarify the scope of this court's reviewing function.

■ The Commission's decision to eliminate or modify existing regulations and to adopt new rules and policies in their stead is a product of informal rulemaking procedures conducted pursuant to Section 4 of the APA, 5 U.S.C. § 553 (1976). The orders

are therefore reviewable under the APA's Section 10(e)(2)(A), 5 U.S.C. § 706(2)(A) (1976), which requires us to hold unlawful and set aside any "agency action, findings, and conclusions" found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." [11] Recognizing the applicability of this "arbitrary and capricious" standard is, however, but the beginning of our delineation of the appropriate scope of review. Over the years, these phrases "arbitrary," "capricious," and "abuse of discretion," as well as the judicial precedent interpreting them, have developed a deceptively talismanic quality—the mere mechanistic incantation of the terms is presumed to evoke the appropriate judicial mind-set. Yet, we must be cautious in our review lest the oft-cited formulas serve to disguise rather than to elucidate the true nature of our inquiry.

At the risk of over-simplification, one can portray our present task as encompassing two quite distinct functions. First, we must decide whether the Commission has acted within its delegated authority under the Act in adopting these deregulatory orders. Only then may we pass to the question whether the rules and policies ultimately adopted are the product of a rational decisionmaking process.

### A. *Delegated Authority*

■ Our standard of review as to the first inquiry is clear. Traditionally, in determining whether the Commission has acted within its legally delegated authority, courts accord only limited deference to an agency's interpretation of its own governing statute.[12] To do otherwise would risk

---

11. *See, e.g., FCC v. WNCN Listeners Guild,* 450 U.S. 582, 594, 101 S.Ct. 1266, 1274, 67 L.Ed.2d 521 (1981); *Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council, Inc.,* 435 U.S. 519, 535–536 & n. 14, 98 S.Ct. 1197, 1207–1208 & n. 14, 55 L.Ed.2d 460 (1978).

12. The APA appears to require *de novo* review of all questions of law: "[t]o the extent necessary for decision and when presented, the reviewing court shall decide all relevant questions of law." 5 U.S.C. § 706(1) (1976).

However, courts almost always accord some deference to an agency's statutory construction. This deference can range from mere acknowledgment of the prior agency decision, *e.g., Skidmore v. Swift & Co.,* 323 U.S. 134, 139–140, 65 S.Ct. 161, 164, 89 L.Ed. 124 (1944) (agency decision constitutes a body of informed judgment), to more substantial deference under the rational basis test, *e.g., NLRB v. Hearst Publications, Inc.,* 322 U.S. 111, 131, 64 S.Ct. 851, 860, 88 L.Ed. 1170 (1944) (agency's statutory construction to be upheld "if it has 'warrant in the record' and a reasonable basis in

diluting the judiciary's power to stand guard against bureaucratic excesses by ensuring that administrative agencies remain within the bounds of their delegated authority. Indeed, it is the quintessential function of the reviewing court to interpret legislative delegations of power and to strike down those agency actions that traverse the limits of statutory authority.[13]

However, the Commission is not the typical agency, nor is the Act a model of statutory clarity. Congress' clear intent in 1934 was to confer upon the Commission sweeping authority to regulate in "a field of enterprise the dominant characteristic of which was the rapid pace of its unfolding." *Nat'l Broadcasting Co. v. United States,* 319 U.S. 190, 219, 63 S.Ct. 997, 1010, 87 L.Ed. 1344 (1943). In lieu of specific legislative directives, the Commission was provided with a broad mandate to regulate broadcasting in the "public interest, convenience, and necessity." Early on, this "public interest standard" was characterized as "a supple instrument for the exercise of discretion by the expert body which Congress has charged to carry out its legislative policy." *FCC v. Pottsville Broadcasting Co.,* 309 U.S. 134, 138, 60 S.Ct. 437, 439, 84 L.Ed. 656 (1940). Later commentators have been less charitable. Professor Jaffe has portrayed the Commission as a victim of Congress' failure to provide guidance, destined to flail about in a regulatory area that is a "jungle

without statutory directives."[14] Yet another critic has claimed that "[t]elling the FCC to act in the public interest is the practical equivalent of saying: 'Here is the regulatory problem; deal with it as you will.' "[15]

But if Congress had in fact given the Commission such completely unfettered discretion, the Act would constitute an unconstitutionally indefinite and unlimited delegation of legislative policymaking power. In 1943 the Supreme Court put to rest any remaining doubts that the public interest standard is so vague as to fail to provide judicially-enforceable constraints on the Commission's exercise of authority.[16] Justice Frankfurter's opinion in *Nat'l Broadcasting Co. v. United States, supra,* affirmed both the constitutionality and the wisdom of the standard:

> The Commission was, however, not left at large in performing this duty [to regulate broadcasting]. The touchstone provided by Congress was the "public interest, convenience, or necessity," a criterion which "is as concrete as the complicated factors for judgment in such a field of delegated authority permit." * * * [17]

The Act's delegation of legislative authority is not unconstitutional, he concluded, because the public interest standard is not simply "a mere general reference to public welfare without any guide to determinations. The purpose of the Act, the require-

---

law"). *See generally* Pierce & Shapiro, *Political and Judicial Review of Agency Action,* 59 Texas L.Rev. 1175, 1182–1183 (1981).

**13.** As Justice Jackson once argued:
[A]dministrative experience is of weight in judicial review only to this point—it is a persuasive reason for deference to the Commission in the exercise of its discretionary powers under and within the law. It cannot be invoked to support action outside of the law. And what action is, and what is not, within the law must be determined by courts
* * *. * * *
*SEC v. Chenery Corp.,* 332 U.S. 194, 215, 67 S.Ct. 1575, 1762, 91 L.Ed. 1995 (1947) (Jackson, J., dissenting).

**14.** L. Jaffe, Judicial Control of Administrative Action 48 (1965). *See also* Jaffe, *WHDH: The FCC and Broadcasting License Renewals,* 82 Harv.L.Rev. 1693, 1700 (1969).

**15.** 4 B. Schwartz, The Economic Regulation of Business and Industry 2374 (1973).

**16.** On several prior occasions the Supreme Court had already upheld the public interest standard against constitutional challenges. *See Federal Radio Comm'n v. Nelson Bros. Co.,* 289 U.S. 266, 285, 53 S.Ct. 627, 636, 77 L.Ed. 1166 (1933); *New York Central Securities Corp. v. United States,* 287 U.S. 12, 24–25, 53 S.Ct. 45, 48, 77 L.Ed. 138 (1932) (Interstate Commerce Commission).

**17.** *Nat'l Broadcasting Co. v. United States,* 319 U.S. 190, 216, 63 S.Ct. 997, 1009, 87 L.Ed. 1344 (1943) (quoting *FCC v. Pottsville Broadcasting Co.,* 309 U.S. 134, 138, 60 S.Ct. 437, 439, 84 L.Ed. 656 (1940)).

ments it imposes, and the context of the provision in question show the contrary." [18]

 Ascertaining the precise limits of the Commission's authority thus requires a delicate balance. On the one hand, the judgment of the Commission as to what the public interest entails and how it may best be served is entitled to considerable judicial deference.[19] Yet this deference is limited by the irreducible element of law that must ultimately constrain the Commission and that we alone must interpret. Our task is to give content and meaning to the Act's public interest standard so that it serves, not to shield Commission determinations from judicial scrutiny, but, more positively, as a source of true guidance for the Commission.

 In sum, when the Commission interprets the Act so as to find sufficient legal authority to act, we may give due consideration to the Commission's interpretation, but we cannot relinquish our duty to conduct an independent analysis. We will therefore scrutinize these orders closely to assure ourselves that the Commission has acted within its authority under the Act. It is beyond cavil that, notwithstanding the acknowledged breadth of the Commission's powers to codify by regulation its view of the public interest, courts remain "the final authorities on issues of statutory construction * * * and 'are not obliged to stand aside and rubber-stamp their affirmance of administrative decisions that they deem inconsistent with a statutory mandate or that frustrate the congressional policy underlying a statute.'" [20]

## B. Rational Rulemaking

Beyond this threshold question of whether the Commission acted within its statutory authority, our review of the Commission's decisionmaking process is considerably more limited and deferential. Recently, this court summarized the familiar litany of descriptive standards by which we test an agency's reasoning process under the arbitrary and capricious standard:

[The] agency action is presumed to be valid in the absence of a substantial showing to the contrary. The court's review is not merely a summary endorsement, however, but should be searching and careful. While the level of review is not to be perfunctory it is relatively narrow and designed only to insure that the agency's decision is not contrary to law, is rational, has support in the record, and is based on a consideration of the relevant factors. This includes the agency's addressing the significant comments made in the rulemaking proceeding.... [W]e will demand that the Commission consider reasonably obvious alternative ... rules, and explain its reasons for rejecting alternatives in sufficient detail to permit judicial review. At the same time, however, our review of the Commission's factual, and particularly its policy, determinations will perforce be a narrow one, limited to insuring that the Commission has adequately explained the facts and policy concerns it relied on and to satisfying ourselves that those facts have some basis in the record. Finally, we must see "whether those facts and legislative considerations by themselves could

---

18. *Id.* at 226, 63 S.Ct. at 1014, *quoting New York Central Securities Corp. v. United States,* supra note 16, 287 U.S. at 24, 53 S.Ct. at 48. More recently, the Supreme Court held once again that the term "public interest" in a regulatory statute "is not a broad license to promote the general public welfare. Rather, the words take meaning from the purposes of the regulatory legislation." *NAACP v. FPC,* 425 U.S. 662, 669, 96 S.Ct. 1806, 1811, 48 L.Ed.2d 284 (1976).

19. *See, e.g., FCC v. WNCN Listeners Guild,* supra note 11, 450 U.S. at 596, 101 S.Ct. at

1275 (Commission's judgment regarding how the public interest is best served is entitled to substantial judicial deference); *FCC v. Nat'l Citizens Committee for Broadcasting,* 436 U.S. 775, 810, 98 S.Ct. 2096, 2119, 56 L.Ed.2d 697 (1978); *FCC v. WOKO, Inc.,* 329 U.S. 223, 229, 67 S.Ct. 213, 216, 91 L.Ed. 204 (1946).

20. *Volkswagenwerk Aktiengesellschaft v. FMC,* 390 U.S. 261, 272, 88 S.Ct. 929, 935, 19 L.Ed.2d 1090 (1968), *quoting NLRB v. Brown,* 380 U.S. 278, 291, 85 S.Ct. 980, 988, 13 L.Ed.2d 839 (1965).

lead a reasonable person to make the judgment that the Agency has made." [21]

Yet, the intensity of review under this standard is certainly not immutable.[22] In fact, in this case our level of scrutiny is heightened because so many of the Commission's actions involve some departure from prior policies and precedents.[23] Of course, this court fully appreciates the need, and indeed the responsibility, of the Commission to reevaluate its regulatory standards over time.[24] Periodic examination of the continued vitality of regulatory approaches should not be discouraged; Congress in fact vested this Commission with broad discretion precisely to facilitate such modifications of administrative policies in

light of developments in the evolving broadcast industry.[25]

While we do not then challenge the Commission's theoretical right to modify, or even overrule, long-standing precedents,[26] such abrupt shifts in policy do constitute "danger signals" that the Commission may be acting inconsistently with its statutory mandate.[27] We will require therefore that the Commission provide a "reasoned analysis indicating that prior policies and standards are being deliberately changed, not casually ignored * * *." *Greater Boston Television Corp. v. FCC,* 444 F.2d 841, 852 (D.C.Cir.1970), *cert. denied,* 403 U.S. 923, 91 S.Ct. 2233, 29 L.Ed.2d 701 (1971).[28] More-

**21.** *Telocator Network of America v. FCC,* 691 F.2d 525, 537 (D.C.Cir.1982) (citations and footnotes omitted), *quoting NAACP v. FCC,* 682 F.2d 993, 997–998 (D.C.Cir.1982), *and Natural Resources Defense Council, Inc. v. SEC,* 606 F.2d 1031, 1053 (D.C.Cir.1979). For a summary of relevant decisions further explicating the various elements of this standard of review, *see id.,* 691 F.2d at 537–538 n. 105.

**22.** As this court has observed:

The stringency of our review, in a given case, depends upon analysis of a number of factors, including the intent of Congress, as expressed in relevant statutes, particularly the agency's enabling statute; the needs, expertise, and impartiality of the agency as regards the issue presented; and the ability of the court effectively to evaluate the questions posed. * * *

*Natural Resources Defense Council, Inc. v. SEC, supra* note 21, 606 F.2d at 1050.

**23.** The heightened level of scrutiny is frequently referred to as the "hard look" doctrine. *See Greater Boston Television Corp. v. FCC,* 444 F.2d 841, 850–853 (D.C.Cir.1970), *cert. denied,* 403 U.S. 923, 91 S.Ct. 2233, 29 L.Ed.2d 701 (1971); *Environmental Defense Fund, Inc. v. Ruckelshaus,* 439 F.2d 584 (D.C.Cir.1971); Leventhal, *Environmental Decisionmaking and the Role of the Courts,* 122 U.Pa.L.Rev. 509, 511 (1974). More aggressive review under the arbitrary and capricious standard may be appropriate in any number of circumstances. *See, e.g., Natural Resources Defense Council, Inc. v. SEC, supra* note 21, 606 F.2d at 1050 (level of scrutiny dependent in part on the nature of problem under agency consideration); *Central Florida Enterprises, Inc. v. FCC,* 598 F.2d 37, 49–51 (D.C.Cir.1978) (heightened scrutiny triggered by demonstration of agency bias in proceedings). *See generally* S. Breyer & R. Stewart, Administrative Law and Regulatory Policy

291–293 (1979); Diver, *Policymaking Paradigms in Administrative Law,* 95 Harv.L.Rev. 393, 411–413 (1981); Verkuil, *Judicial Review of Informal Rulemaking,* 60 Va.L.Rev. 185 (1975).

**24.** *See Pinellas Broadcasting Co. v. FCC,* 230 F.2d 204, 206 (D.C.Cir.), *cert. denied,* 350 U.S. 1007, 16 S.Ct. 650, 100 L.Ed. 869 (1956).

**25.** The Supreme Court has also added its imprimatur to this general proposition:

Regulatory agencies do not establish rules of conduct to last forever; they are supposed, within the limits of the law and of fair and prudent administration, to adapt their rules and practices to the Nation's needs in a volatile, changing economy. They are neither required nor supposed to regulate the present and the future within the inflexible limits of yesterday.

*American Trucking Ass'ns, Inc. v. Atchison, Topeka & Santa Fe R. Co.,* 387 U.S. 397, 416, 87 S.Ct. 1608, 1618, 18 L.Ed.2d 847 (1967) (referring to Interstate Commerce Commission).

**26.** *See, e.g., FCC v. WOKO, Inc., supra* note 19; *Columbia Broadcasting System, Inc. v. FCC,* 454 F.2d 1018, 1026 (D.C.Cir.1971).

**27.** *See Joseph v. FCC,* 404 F.2d 207, 212 (D.C.Cir.1968) (Leventhal, J.). *See also State Farm Mutual Auto. Ins. Co. v. Dep't of Transportation,* 680 F.2d 206, 220–222 (D.C.Cir.1982), *cert. granted,* —— U.S. ——, 103 S.Ct. 340, 74 L.Ed.2d 382 (1982).

**28.** *See also State Farm Mutual Auto. Ins. Co. v. Dep't of Transportation, supra* note 27, 680 F.2d at 229–230; *NAACP v. FCC, supra* note 21, 682 F.2d at 998; *RKO General, Inc. v. FCC,* 670 F.2d 215, 223–224 (D.C.Cir.1981); *Hatch v. FERC,* 654 F.2d 825, 834 (D.C.Cir.1981); *Balti-*

over, we will scrutinize closely the analytical and factual bases for the choices made, requiring that the Commission provide sufficient analysis and explanation of the grounds for its decision. As we recently explained:

[I]t is vital that an agency justify a departure from its prior determinations. * * [T]he requirement of reasons imposes a measure of discipline on the agency, discouraging arbitrary or capricious action by demanding a rational and considered discussion of the need for a new agency standard. The process of providing a rationale that can withstand public and judicial scrutiny compels the agency to take rule changes seriously. The agency will be less likely to make changes that are not supported by the relevant law and facts. * * * [29]

 Finally, we will look carefully at the Commission's reasoning to ensure that all relevant factors and available alternatives were given adequate consideration in the course of the rulemaking proceedings.[30] Only then can the Commission be deemed to have made a truly reasoned choice. In short, if the Commission should alter a policy and yet fail to recognize the change or fail to provide either adequate explanation or adequate consideration of relevant fac-

tors and alternatives, we must set aside the Commission's action and remand for further proceedings.[31]

## III. REVIEW OF THE MERITS

### A. Nonentertainment Programming Policies

The Commission has substantially redefined its policies and expectations relating to the nonentertainment programming responsibilities of radio licensees. Petitioners challenge these new substantive requirements of the Act's public interest standard and the applicable provisions of the APA. We shall evaluate each argument in turn.

#### 1. Public interest programming obligations.

Contrary to the dire intimations of some petitioners,[32] the Commission has *not* effectively foresworn all regulation of nonentertainment programming in favor of total reliance on marketplace forces. It is true that the Commission's notice of rulemaking indicated that its *preferred* option was to rely totally on the market and the decisions of individual licensees to set the amounts and types of nonentertainment programming.[33] Ultimately, however, the Commission in its *Report and Order* rejected such

---

*more & Annapolis R. Co. v. WMATC,* 642 F.2d 1365, 1370 (D.C.Cir.1980).

**29.** *Baltimore & Annapolis R. Co. v. WMATC, supra* note 28, 642 F.2d at 1370. *See Nat'l Tour Brokers Ass'n v. ICC,* 671 F.2d 528, 532 (D.C.Cir.1982); *Harborlite Corp. v. ICC,* 613 F.2d 1088, 1092 (D.C.Cir.1979).

**30.** On the requirement that the policy change be based on a consideration of the relevant factors, *see FCC v. Nat'l Citizens Committee for Broadcasting, supra* note 19, 436 U.S. at 803, 98 S.Ct. at 2116; *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 416, 91 S.Ct. 814, 823, 28 L.Ed.2d 136 (1971); *Home Box Office, Inc. v. FCC,* 567 F.2d 9, 36 (D.C. Cir.) (*per curiam*), *cert. denied,* 434 U.S. 829, 98 S.Ct. 111, 54 L.Ed.2d 89 (1977).

On the requirement that the agency adequately consider available alternatives, *see Nat'l Citizens Committee for Broadcasting v. FCC,* 567 F.2d 1095, 1110–1115 (D.C.Cir.1977); *Pillai v. CAB,* 485 F.2d 1018, 1029 (D.C.Cir. 1973); Ackerman & Hassler, *Beyond the New*

*Deal: Coal and the Clean Air Act,* 89 YALE L.J. 1466, 1565 (1980) ("the objective of judicial review remains as it was under the classical New Deal conception—to assure a full and focused airing of plausible policy options before officials make decisions of consequence").

**31.** For examples of the use of the remand technique, *see State Farm Mutual Auto. Ins. Co. v. Dep't of Transportation, supra* note 27; *Nat'l Citizens Committee for Broadcasting v. FCC, supra* note 30; *Environmental Defense Fund, Inc. v. Ruckelshaus, supra* note 23.

**32.** For example, petitioners UCC and CRC charge that the Commission has "drastically curtailed the programming responsibilities of radio broadcasters, thereby virtually abandoning the public interest standard of the Communications Act * * *." UCC & CRC reply brief at 5.

**33.** *See Notice,* 73 FCC2d at 529–532, JA 267–270.

complete deregulation,[34] and explicitly reaffirmed a public interest obligation for all radio licensees:

> [A] strict market approach to nonentertainment programming is unworkable at the present time. Such an approach would be both administratively inconvenient and could be construed as contrary to the Act which mandates the licensing of individual stations. * * *

*Report and Order,* 84 FCC2d at 1071, JA 134. The Commission explained further:

> Licensees traditionally have had individual responsibilities to operate their stations in the public interest and while we believe that stations can make programming determinations as to type, content and, to an extent, amount based upon what other services are available, each licensee has a bedrock obligation, historically rooted, to cover public issues. * * *

*Id.*

Petitioners challenge the Commission's redefinition of the licensees' nonentertainment programming obligation. They claim that the Commission has acted arbitrarily and contrary to the Act by restricting the licensees' programming obligation to the provision of "issue-responsive" programming—thereby ignoring the value of other types of programs that had once been deemed "major elements usually necessary to meet the public interest * * *."[35] Petitioners also assert that the Commission has

failed to provide an adequate explanation for why categories of programming, such as educational or religious programs, have somehow ceased to serve the public interest.

 We find that the Commission's imposition on licensees of an obligation to provide programming responsive to community issues constitutes a reasonable interpretation of the public interest standard. As the Supreme Court has reiterated, "[T]he words 'public interest' in a regulatory statute * * * take meaning from the purposes of the regulatory legislation."[36] Here the Commission's delineation of a public interest programming obligation is fully consistent with congressional intent and judicial interpretation. The regulatory scheme that Congress envisioned for the broadcast industry was a unique hybrid of private sector ownership of the broadcast licenses tempered by public service responsibilities; in return for "the free and exclusive use of a limited and valuable part of the public domain," broadcasters were to be "burdened by enforceable public obligations." *Office of Communication of United Church of Christ v. FCC,* 359 F.2d 994, 997, 1003 (D.C.Cir.1966).[37]

The clear intent of the Act was that the award of a broadcasting license should be a "public trust."[38] While the legislative debate on the 1934 Act was surprisingly limit-

---

**34.** Because the orders now on review do not adopt that option, we need not consider whether the Act would permit the Commission to rely solely on market forces in the area of nonentertainment programming. After the *Notice* was published, the Supreme Court decided *FCC v. WNCN Listeners Guild, supra* note 11, distinguishing between regulation of entertainment and nonentertainment programming. 450 U.S. at 603, 101 S.Ct. at 1278.

**35.** *Programming Statement,* 44 FCC at 2314. *See* p. 1421 *supra.*

**36.** *NAACP v. FPC, supra* note 18, 425 U.S. at 669, 96 S.Ct. at 1811. *See also Bilingual Bicultural Coalition v. FCC,* 595 F.2d 621, 628 (D.C. Cir.1978).

**37.** The Act's "balance between private and public control" is discussed thoroughly in *Columbia Broadcasting System, Inc. v. Democrat-*

*ic Nat'l Committee,* 412 U.S. 94, 104, 93 S.Ct. 2080, 2087, 36 L.Ed.2d 772 (1973). As Chief Justice Burger points out, various provisions of the Act "evince a legislative desire to preserve values of private journalism under a regulatory scheme which would insure fulfillment of certain public obligations." *Id.* at 109, 93 S.Ct. at 2090.

**38.** Certainly the "public trust" model has long been accepted by this court. *See, e.g., Citizens Communications Center v. FCC,* 447 F.2d 1201, 1214 (D.C.Cir.1971); *Office of Communication of United Church of Christ,* 425 F.2d 543, 548 (D.C.Cir.1969) ("By whatever name or classification, broadcasters are temporary permittees—fiduciaries—of a great public resource * * *.).

ed,[39] one legislator did point out that "[i]f enacted into law, the broadcasting privilege will not be a right of selfishness. It will rest upon an assurance of public interest to be served."[40] A clearer indication of congressional acceptance of the public trust doctrine inherent in the Act can be found in the Senate Report accompanying the 1959 amendments to the Act: "[B]roadcast frequencies are limited and, therefore, they have been necessarily considered a public trust. Every licensee who is fortunate in obtaining a license is mandated to operate in the public interest."[41]

This concept of the broadcast licensee as "public trustee" has had its most important and delicate implications in the area of program content regulation. While nothing in the Act expressly grants the Commission authority to regulate programming, the Commission *is* instructed to grant and renew broadcast licenses on the basis of the "public interest, convenience, and necessity."[42] This power to license in the public interest was held necessarily to entail the power to license on the basis of program service. In his landmark interpretation of the Act's public interest standard, Justice Frankfurter explicated the Commission's authority over programming as follows:

> "[W]e are asked to regard the Commission as a kind of traffic officer, policing the wave lengths to prevent stations from interfering with each other. But the Act does not restrict the Commission merely to supervision of the traffic. It puts upon the Commission the burden of determining the composition of that traffic. * * *
>
> \* \* \* \* \* \*

* * * "An important element of public interest and convenience affecting the issue of a license is the ability of the licensee to render the best practicable service to the community reached by his broadcasts." *Federal Communications Comm'n v. Sanders Radio Station*, 309 U.S. 470, 475, 60 S.Ct. 693, 697, 84 L.Ed. 869. The Commission's licensing function cannot be discharged, therefore, merely by finding that there are no technological objections to the granting of a license. If the criterion of "public interest" were limited to such matters, how could the Commission choose between two applicants for the same facilities, each of whom is financially and technically qualified to operate a station? Since the very inception of federal regulation [of] radio, comparative considerations as to the services to be rendered have governed the application of the standard of "public interest, convenience, or necessity." * * * [43]

Since the Commission has the power to make license determinations on the basis of programming, then it perforce has the power—and in fact the responsibility— to define the licensees' public interest obligations *with respect to programming.*[44] In defining this programming component of the public interest standard, the Commission must, of course, be wary of slipping over that dividing line between permissible government regulation within the Act's public trustee framework and impermissible government censorship, prohibited by the First Amendment and the Communications Act alike.[45]

---

39. *See* 4 B. SCHWARTZ, *supra* note 15, at 2376.

40. *See* 67 Cong.Rec. 5479 (1926) (remarks of Rep. White).

41. S.Rep. No. 562, 86th Cong., 1st Sess. 8 (1959), U.S.Code Cong. & Admin.News 1959, pp. 2564, 2571.

42. *See* 47 U.S.C. § 307(a), (d) (1976).

43. *Nat'l Broadcasting Co. v. United States, supra* note 17, 319 at 215–217, 63 S.Ct. at 1009–1010.

44. *See Banzhaf v. FCC,* 405 F.2d 1082, 1095 (D.C.Cir.1968). *See also* S. BREYER & R. STEWART, *supra* note 23, at 374 ("Surely a Commission asked to award licenses in the public interest must have 'good programming' as some kind of objective; to ignore programming entirely would make a mockery of its mission.").

45. 47 U.S.C. § 326 (1976) provides in pertinent part:

> Nothing in this chapter shall be understood or construed to give the Commission the power of censorship * * *, and no regulation or condition shall be promulgated or fixed by

 In these proceedings the Commission has deliberately redefined the programming responsibilities of radio licensees so as to provide greater discretion to licensees within the limits of their statutory obligations as public trustees.[46] As has been noted, the Act provides virtually no specifics as to the nature of those public obligations inherent in the public interest standard. However, over the years Congress, the Supreme Court, and the Commission have left no doubt that the regulatory scheme envisioned by the drafters of the Act imposes upon licensees *some* affirmative obligation to present informational programming. The clearest evidence of this obligation is the 1959 amendment to Section 315 of the Act which provided that equal time be accorded each political candidate. Congress amended the equal time provision in order to exempt appearances on news programs, but qualified its exemption by stating that it intended no exception "from the obligation imposed upon them under this Act to operate in the public interest and to afford reasonable opportunity for the discussion of conflicting views on issues of public importance." [47]

 According to the Supreme Court in *Red Lion Broadcasting Co. v. FCC,* 395 U.S. 367, 380, 89 S.Ct. 1794, 1801, 23 L.Ed.2d 371 (1969), "This language makes it very plain that Congress, in 1959, announced that the phrase 'public interest,' which had been in the Act since 1927, imposed a duty on broadcasters to discuss both sides of controversial public issues." [48] A few years later the Court held more generally that, under the Act, "[t]he regulatory scheme evolved slowly, but very early the licensee's role developed in terms of a 'public trustee' charged with the duty of fairly and impartially informing the public audience." [49]

Finally, for the last 50 years, in its major policy statements setting forth the programming obligations under the public interest standard, the Commission has consistently stressed the importance of broadcasting "discussions of issues of importance to the public." [50] Its latest pronouncement,

the Commission which shall interfere with the right of free speech by means of radio communication.

**46.** We take this opportunity to note the Commission's error in characterizing the programming obligation as "non-statutory." *See Report and Order,* 84 FCC2d at 977, JA 40. As is developed in text, the public interest standard itself clearly imposes statutory nonentertainment programming obligations on licensees.

**47.** Act of Sept. 14, 1959, Pub.L. No. 86–274 § 1, 73 Stat. 557, *amending* 47 U.S.C. § 315(a).

**48.** Great weight is traditionally given to the declaration by a subsequent Congress of the intent of an earlier statute. *See Red Lion Broadcasting Co. v. FCC,* 395 U.S. 367, 380–381, 89 S.Ct. 1794, 1801, 23 L.Ed.2d 371 (1969); *Federal Housing Admin. v. Darlington, Inc.,* 358 U.S. 84, 90, 79 S.Ct. 141, 145, 3 L.Ed.2d 132 (1958).

**49.** *Columbia Broadcasting System, Inc. v. Democratic Nat'l Committee, supra* note 37, 412 U.S. at 117, 93 S.Ct. at 2093.

**50.** *Great Lakes Broadcasting Co.,* 3 FRC Ann. Rep. 32, 33 (1929), *rev'd on other grounds sub nom. Great Lakes Broadcasting Co. v. Federal Radio Comm'n,* 37 F.2d 993 (D.C.Cir.), *cert. dismissed,* 281 U.S. 706, 50 S.Ct. 467, 74 L.Ed. 1129 (1930). In its second major programming

policy statement, the Commission concluded that "the public interest clearly requires that an adequate amount of time be made available for the discussion of public issues; and the Commission, in determining whether a station has served the public interest, will take into consideration the amount of time which has been or will be devoted to the discussion of public issues." FCC, Public Service Responsibility of Broadcast Licensees 40 (March 7, 1946). *See generally Report and Order,* 84 FCC2d at 979–982, 1040–1042, JA 42–45, 103–105. Additionally, the Commission's Fairness Doctrine, also deriving from the public interest standard, has long imposed a separate obligation on broadcasters to devote reasonable amount of time to discussion of conflicting views on issues of public importance. *See generally Red Lion Broadcasting Co. v. FCC, supra* note 48 (upholding Fairness Doctrine against constitutional attack).

It should be noted that Congress has not overturned by legislation this consistent course of administrative practice, thereby providing implicit approval for such Commission interpretations. *See, e.g., Haig v. Agee,* 453 U.S. 280, 300, 101 S.Ct. 2766, 2788, 69 L.Ed.2d 640 (1981); *Zemel v. Rusk,* 381 U.S. 1, 11–12, 85 S.Ct. 1271, 1278, 14 L.Ed.2d 179 (1965) ("Congress' failure to repeal or revise [a statute] in the face of such administrative interpretation has been held to constitute persuasive evidence

requiring nonentertainment programming to address issues of concern to the licensee's community, is thus consistent with its own past practice, as well as with congressional and judicial interpretations of the Act.

 In short, the Commission's affirmation of this public interest obligation to provide issue-responsive programming is faithful to and compatible with the Act, its legislative history, and subsequent judicial and administrative interpretations. Moreover, petitioners fail to show that the public interest standard mandated anything more. Neither the Act itself nor the legislative history necessitates a Commission requirement that licensees offer a particular *type* of programming—*e.g.*, religious, educational, etc. In fact, Congress in the past has explicitly rejected proposals to require compliance by licensees with subject-matter programming priorities.[51] And at least one court has held that a Commission requirement mandating particular program categories would raise very serious First Amendment questions.[52] Since the Act itself does not require retention of the Commission's consideration of programming categories, we cannot say that the Commission acted beyond its statutory authority in imposing only this bedrock obligation to cover public issues.

### 2. *Issue-responsive programming.*

Petitioners also challenge the new issue-responsive programming focus as being arbitrary, capricious, and without adequate justification within the meaning of the APA.[53] They assert that the Commission has irrationally limited its concern to issue-

responsive programming, failing to explain why the other types of nonentertainment offerings—such as religious, educational, and news programs—should not also be counted toward meeting the public interest programming obligation.[54]

Petitioners' arguments have some merit. While the Commission's decision to focus on issue-responsive programming is clearly within its statutory authority to make, neither the *Report and Order* nor the *Reconsideration Order* provides a particularly thorough explanation for this major policy shift. Indeed, the Commission studiously avoids providing any direct, comparative analysis of the costs and benefits attendant to casting the public interest obligation in terms of issues and not program categories. This failure to provide a careful explication of its reasoning process is troubling, and might ordinarily necessitate a remand. However, since the policy change is not as drastic as petitioners portray, and the Commission has in fact recognized and provided some explanation of its policy choice, we cannot set aside the decision.

To begin with, nothing in the *Report and Order* indicates that the Commission will henceforth disregard the categories of programs that prompt petitioners' concerns. The Commission explicitly states that

radio broadcasters [may] address issues by virtually any means. *This includes programming described under current definitions,* and can consist of, by way of example and not limitation, public affairs, public service announcements, editorials, free speech messages, community

that that interpretation is the one intended by Congress").

**51.** *See* H.R.Rep. No. 7357, 68th Cong., 1st Sess. § 1(B) (1924).

**52.** *See Nat'l Ass'n of Independent Television Producers & Distributors v. FCC,* 516 F.2d 526, 536 (2d Cir.1975).

**53.** *See* UCC & CRC brief at 35–38; Geller brief at 8–14.

**54.** Petitioners UCC and CRC also claim that the Commission's issue-responsive focus fails to require licensees to provide locally-produced

programming, thereby violating § 307(b) of the Act. We do not believe that the Commission has acted inconsistently with that provision. "All that section requires is that the Commission act to ensure a fair, efficient, and equitable distribution of radio service throughout the country." *Loyola University v. FCC,* 670 F.2d 1222, 1226 (D.C.Cir.1982). As long as the Commission requires licensees to provide programming—whatever its source—that is responsive to their communities, § 307(b) is satisfied.

bulletin boards, and religious programming. * * * [55]

It is clear then that a licensee may still use its programming efforts in the religious or educational areas, for example, as evidence of its responsiveness to community issues. Thus, a program featuring a panel of priests, ministers, and rabbis discussing recent statements by Catholic bishops on the morality of the nuclear arms race would certainly be considered public interest programming under either an issue or a category focus.

Moreover, the Commission has clarified its use of the term "issue," stressing its broader definition as "[a] point of discussion, debate, or dispute, * * * [a] matter of wide public concern." *Reconsideration Order,* 87 FCC2d at 818, JA 22. Under such a sweeping definition, we are hard-pressed to think of examples of programming categories described in the 1960 *Programming Statement* whose content could not also be described in issue terms and thus still come within the Commission's delineation of public interest programming.[56] Finally, the Commission pointed out that even during the regime of the 1960 *Programming Statement* there was no requirement that every station present some programming in each category.[57] Then, as now, the Commission simply imposed a general obligation to provide responsive nonentertainment programming; the manner by which the programming obligation is fulfilled—*i.e.,* the selection of the actual programs—has always been left to the editorial discretion of the licensee.[58] In short, then, while the Com-

mission has clearly reoriented its public interest inquiry away from categories, the extent and foreseeable consequences of that policy shift should not be overestimated.

The Commission explains the change and justifies its decision as follows:

> Other than issue responsive programming, stations need not, as a Commission requirement, present news, agricultural, *etc.,* programming. * * *
>
> * * * * * *
>
> * * * [T]he chief concern has always been that issues of importance to the community will be discovered by broadcasters and will be addressed in programming so that the informed public opinion, necessary to the functioning of a democracy, will be possible. Accordingly, we will require that stations program to address those issues that it believes [*sic*] are of importance to the general community or * * * to its own listenership. In this fashion we believe that we will best assure that the bedrock obligation contemplated by the "public interest" will be fulfilled with the least government intrusion and with the most licensee flexibility. * * * [59]

This and similar statements, while somewhat conclusory, suffice to satisfy this court both that the Commission was aware that it was changing its views and that it has articulated comprehensible and permissible reasons for that change. *See, e.g., State Farm Mutual Auto. Ins. Co. v. Dep't of Transportation,* 680 F.2d 206, 229–230 (D.C.Cir.1982), *cert. granted,* —— U.S.

---

**55.** *Report and Order,* 84 FCC2d at 982–983, JA 45–46 (emphasis added).

**56.** For example, petitioner Geller at oral argument stressed the allegedly counter-intuitive result that under the Commission's new policy children's educational programs, such as a radio version of Sesame Street, would not be considered public interest programming. In our view, this apprehension is premature. We are convinced that a Commission concerned with helping to create an informed citizenry would view children's informational programming as an important component of that process.

Of course, precisely what types of programs will in fact be considered to determine if the

station is meeting its public interest programming obligation will become more clear in the context of actual renewal proceedings.

**57.** *See Evening Star Broadcasting Co.,* 27 FCC2d 316, 333, *aff'd sub nom. Stone v. FCC,* 466 F.2d 316 (D.C.Cir.1972).

**58.** *See Muir v. Alabama Educational Television Comm'n,* 656 F.2d 1012, 1017 (5th Cir.1981) (the Act envisages the licensee as having the absolute right to select programs).

**59.** *Report and Order,* 84 FCC2d at 978, 982, JA 41, 45.

——, 103 S.Ct. 340, 74 L.Ed.2d 382 (1982); *Office of Communication of United Church of Christ v. FCC,* 560 F.2d 529, 532 (2d Cir.1977).

 We believe that this decision to define the programming obligation in terms of issues alone is just that type of policy judgment that is entitled to substantial judicial deference.[60] In modifying its policy, the Commission has chosen to value most highly the goal of preserving licensee discretion and flexibility in selecting the types of programming which are responsive to community issues. Seeking to maximize the journalistic discretion of licensees, especially in the constitutionally sensitive area of informational programming, is clearly consistent with the Commission's statutory duty to "chart a workable 'middle course' in its quest to preserve a balance between the essential public accountability and the desired private control of the media." *Columbia Broadcasting System, Inc. v. Democratic Nat'l Committee,* 412 U.S. 94, 120, 93 S.Ct. 2080, 2095, 36 L.Ed.2d 772 (1973). In short, while we appreciate petitioners' arguments that it would be desirable as a matter of policy for radio licensees to serve a broader range of community needs than simply the need for "issue" information, we cannot conclude as a matter of law that the Commission is required to impose a more inclusive programming obligation.[61]

**60.** *See FCC v. WNCN Listeners Guild, supra* note 11, 450 U.S. at 596, 101 S.Ct. at 1275.

**61.** This court addressed itself to an analogous situation in *Stone v. FCC, supra* note 57. In that case appellants argued that the Commission's ascertainment procedures, requiring broadcast licensees to identify and address community "problems," did not adequately explore such nonproblem areas of the community as family life, art, and social interaction. As we stated, such nonproblem, public needs are "often much more important in both everyday life and in media programming than the problems of a community." 466 F.2d at 328 n. 44. However, the decision to so limit the ascertainment inquiry was likewise clearly *within the* reasonable discretion of the Commission. *Id. Accord, Alianza Federal de Mercedes v. FCC,* 539 F.2d 732, 736–739 (D.C.Cir.1976).

**62.** *See also* NAACP brief at 28–29 (Commission acted irrationally and contrary to Act's public interest standard by disregarding com-

### 3. *Quantity of nonentertainment programming.*

Next, petitioners allege that the Commission has "arbitrarily determined that the amount of time devoted to public service programming is never relevant to the public interest determination at renewal." Geller brief at 14.[62] We believe that petitioners have misconstrued the Commission's actions in this area. All parties appear to agree that the elimination of the nonentertainment programming processing guidelines is not at issue in these proceedings.[63] These internal guidelines were purely procedural and simply precluded renewal of a radio license at the staff level if the licensee had proposed less than the prescribed percentages of nonentertainment programming. As petitioners pointed out, "Compliance with the guideline had no decisional significance in challenges to license renewal, and petitions to deny rarely if ever referred to it."[64] This court has in fact explicitly held that the Commission is not required to adopt quantitative guidelines as a means to evaluate the past performance of a radio licensee. *See Nat'l Black Media Coalition v. FCC,* 589 F.2d 578, 581 (D.C.Cir.1978) ("Nothing in the Communications Act imposes any requirement that the FCC promulgate quantitative programming standards.").[65]

pletely the quantity of programming offered by licensee).

**63.** *See, e.g.,* Geller brief at 16; NAACP brief at 21; intervenors American Broadcasting Companies *et al.* brief at 33.

**64.** UCC & CRC brief at 9.

**65.** We do, however, share petitioners' view that the guidelines served a useful function (1) by providing radio licensees with a rough yardstick by which to gauge whether they were devoting a reasonable amount of time to such programming, and (2) by providing the Commission with at least one indicium of the licensee's responsiveness to his community that involved no intrusive inquiries into program content. *Cf.* S. Simmons, The Fairness Doctrine and the Media 222–228 (1978) (advocating even higher percentage guidelines to encourage more substantial compliance with the requirement to provide informational programming).

However, petitioners apparently interpret some of the Commission's statements made in the context of explaining the elimination of the guidelines to mean that the Commission will never look at the quantity of public interest programming in assessing the performance of a renewal applicant. Their confusion is understandable; the Commission's statements are often misleading and contradictory. In its *Reconsideration Order,* for example, the Commission states that it "has not in the past, and will not in the future[,] focus on the total number of minutes or percentage of broadcast time devoted to issue oriented programming," and that "the number of minutes or percentage of broadcasting time devoted to such programming is largely irrelevant." *Reconsideration Order,* 87 FCC2d at 809, 819, JA 13, 23.

■■■ We believe that in making such statements the Commission intended only to "downplay" the significance of absolute numbers of minutes or percentages of broadcast time. Common sense alone dictates that if the Commission has imposed a public interest obligation on radio licensees to provide programming responsive to community issues, the obligation simply cannot be fulfilled without licensees airing some irreducible minimum amount of broadcast minutes. In our view, the Commission sought, not to eliminate all considerations of quantity of nonentertainment programming, but simply to emphasize that quantity alone cannot be the measure of a licensee's responsiveness. The Commission explained its position that "stations should be guided by the needs of their community and the utilization of their own good faith discretion in determining the reasonable amount of programming relevant to issues facing the community that should be presented."[66] Moreover, the Commission

adopts a logical stance in stressing the importance of other factors besides quantity:

> A station with good programs addressing public issues and aired during high listenership times but amounting to only 3% of its weekly programming may be doing a superior job to a station airing 6% nonentertainment programming little of which deals in a meaningful fashion with public issues or which is aired when the audience is small.[67]

The Commission has also acknowledged that some consideration to quantity must be given in the context of evaluating a petition to deny or in a comparative renewal proceeding. A petition to deny the license of a station that had aired little or no nonentertainment programming would certainly constitute a sufficient challenge and would necessitate a hearing: "[T]he public interest would not permit the Commission to allow stations to eliminate all of their nonentertainment programming."[68] It is also clear that, in the comparative renewal setting, the absolute amount of nonentertainment programming aired by the renewal applicant continues to be one of the important factors demonstrating the "substantial service" that may entitle the radio licensee to some degree of "renewal expectancy." *See Central Florida Enterprises, Inc. v. FCC,* 683 F.2d 503, 509 (D.C.Cir.1982). The Commission explains that "[t]he extent to which nonentertainment programming has traditionally been considered in the comparative process is not being changed by this rulemaking * * *."[69]

■■■ In short, despite petitioners' fears and the Commission's misstatements, we view the Commission policy in this area as basically unchanged: The Commission gives discretion to the licensee in determining the amount of nonentertainment programming and reviews the reasonableness of the exer-

---

66. *Report and Order,* 84 FCC2d at 983, JA 46.

67. *Report and Order,* 84 FCC2d at 991, JA 54.

68. *Reconsideration Order,* 87 FCC2d at 815, JA 19. *See also Report and Order,* 84 FCC2d at 990–991, JA 53–54 (relevant allegation for peti-

tion to deny "would consist of a showing that an individual station is doing very little, or nothing, to address through its programming issues facing the community").

69. *Report and Order,* 84 FCC2d at 988, JA 51.

cise of that discretion at renewal time.[70] Quantity of programming remains but one factor in assessing the overall responsiveness of a licensee—a factor that the Commission may choose to deemphasize, but may not ignore altogether.

### 4. Reliance on the programming of other stations.

Finally, we must address the Commission's decision to permit radio stations to "take into account their listenership and its interests, and the services provided by other radio stations in the community to groups other than its own listenership,"[71] in determining which issues to address with nonentertainment programming. According to petitioners, the result of permitting such "specialization" will be the loss of diverse sources of information in any given community and the removal of incentives for each licensee to communicate minority group concerns to majority audiences. See NAACP brief at 46–51; UCC & CRC brief at 29–40. While these concerns are not groundless, the Commission's decision to allow specialization is a reasonable exercise of its broad power to implement its view of the Act's public interest standard and is adequately explained. See FCC v. WNCN Listeners Guild, 450 U.S. 582, 594, 101 S.Ct. 1266, 1274, 67 L.Ed.2d 521 (1981).

Once again, the Commission's decision is motivated by its basic belief that the public interest is best served whenever reliance on licensee discretion, as tempered by the marketplace, can be successfully substituted for governmental regulation. Thus, while the Commission imposes the public interest obligation on every station to provide programming responsive to community issues, it simultaneously seeks to expand the licensee's discretion in deciding the particular issues to be covered, as well as the precise quantity and type of programming. This policy of permitting specialization is, however, also prompted by the Commission's view of current economic conditions in the radio marketplace. According to the Commission, the medium has become increasingly crowded and competitive; specialization of all program services appears to be the key to winning new audiences and assuring financial survival:

> [I]n the early days of radio, it was essential that a few stations provide a broad general service. Today, however, it has become essential in view of the proliferation of radio stations and other broadcast services that radio licensees specialize to attract an audience so that they may remain financially viable. Consequently, policies that may have been necessary in the early days of radio may not be necessary in an environment where thousands of licensees offer diverse sorts of programming and appeal to all manner of segmented audiences. * * * [72]

On this view, then, radio stations must specialize to prosper, and audiences benefit by the increased diversity of program offerings across the market—a benefit that offsets the loss of more diverse programming on any individual station. The listener's flick-of-the-wrist at the radio dial accordingly provides a balanced and diverse coverage of issues.

Petitioners assert that this new policy means the abandonment of the central Commission responsibility to ensure a diversity of informational sources. However, the Commission concludes that by shifting

---

**70.** We do not agree with petitioner Geller's suggestion that a standard of "reasonableness" renders the Commission's determinations impervious to judicial review. For example, we stated in *Alianza Federal de Mercedes v. FCC, supra* note 61, that if a station serving the needs of a 40% minority community targeted only 2% of its public interest programming to that minority group, the Commission—and certainly this court—could easily find that "such a gross disparity in allocation of programming time indicates a broadcaster's failure to serve his community's needs." 539 F.2d at 738. In such a situation, then, despite the fact that the quantity of programming is largely left to the licensee's discretion, the program service may be so minimal in contrast to the needs of the community that it "create[s] a disparity so significant as to amount to a difference in kind rather than in degree." *Id.*

**71.** *Report and Order,* 84 FCC2d at 978, JA 41.

**72.** *Id.* at 969, JA 32.

away from requiring well balanced offerings on each station to allowing issue specialization for each station (thereby achieving balance across the market), it has successfully *enhanced* "the [constitutional] right of the public to receive suitable access to social, political, esthetic, moral, and other ideas and experiences * * *."[73] As the Commission argues, permitting some stations to serve the information needs of its own audience results in "more issues [being] addressed through such specialized programming than through a generalized 'something-for-everyone' requirement." *Report and Order,* 84 FCC2d at 988–989, JA 51–52.[74]

The Commission also addressed itself to petitioners' argument that permitting specialization would result in a loss of communication among various groups in the community, thereby resulting in the "ghettoization" of minority concerns. *See, e.g.,* NAACP brief at 33 n. 4. The Commission stressed that broadcasters "cannot engage in intentional discrimination in their selection of issues." *Report and Order,* 84 FCC2d at 978, JA 41. Moreover, the Commission explicitly concluded that specialization would not bring about such unfortunate consequences: "There is little reason to believe, however, that under deregulation all programming reflecting issues of particular concern to, for instance, minority groups, would disappear from stations directing programming to, for instance, majority audiences." *Id.* at 1072, JA 135.[75]

We find that the Commission's shift in policy is adequately explained and sufficiently supported by economic analysis and logical argument. While petitioners may disagree with both the Commission's predic-

tions of licensee behavior and their factual predicates, this court must defer to the Commission's analysis since "a forecast of the direction in which future public interest lies necessarily involves deductions based on the expert knowledge of the agency." *FPC v. Transcontinental Gas Pipe Line Corp.,* 365 U.S. 1, 19, 81 S.Ct. 435, 445, 5 L.Ed.2d 377 (1961). Petitioners have therefore offered no reason to overturn the Commission's decision that specialization in some situations will best serve the public interest.

### B. Ascertainment Procedures

Petitioner NAACP challenges the Commission's decision to eliminate all formal ascertainment procedures on several grounds: (1) that the Commission failed to explain adequately its departure from prior practices; (2) that the Commission failed to provide adequate evidentiary findings as support for its decision; and (3) that without these ascertainment procedures the Commission will inevitably involve itself in intensive content scrutiny, thereby raising First Amendment problems. *See generally* NAACP brief at 42–49. None of these arguments support reversal of the Commission's decision.

Formal ascertainment requirements were the end-product of many years of policy experimentation by the Commission. The basic principle underlying ascertainment is clear: For a radio licensee to provide programming responsive to issues facing the community, it must first ascertain just what those issues are. The Commission issued its first policy statement on the subject in 1960 and simply required the broadcaster to provide a statement describing the measures taken and efforts made "to dis-

---

**73.** *Red Lion Broadcasting Corp. v. FCC, supra* note 48, 395 U.S. at 390, 89 S.Ct. at 1806.

**74.** Crucial to the reasonableness of this decision is the fact that the Commission will permit radio stations to specialize *only* in the larger radio markets—the *smaller* the market, the fewer the stations, and therefore the broader the programming services that each station must render "to assure programming for all significant segments of the community." *Report and Order,* 84 FCC2d at 989, JA 52.

**75.** This prediction certainly reflects the Commission's reliance on the good-faith intentions and efforts of radio licensees. It may also reflect the less trusting assumption that, for most licensees, complete reliance on another station to provide adequate programming to serve the informational needs of a significant minority population may involve running a considerable risk of facing a petition to deny at renewal time.

cover and fulfill the tastes, needs, and desires of his community or service area." *See Report and Order,* 84 FCC2d at 1073, JA 136. During the next decade the Commission continued to clarify and refine this requirement until, in 1971, it initiated full rulemaking procedures and issued a detailed ascertainment primer. This primer (and the separate primer subsequently developed for several applicants) set out the procedures to be followed in determining the demographic composition of the service area: consulting with community leaders in 19 categories (*e.g.,* business, minority groups, women's organizations, environmental and consumer groups, etc.); conducting general public opinion surveys; and then developing a list of community problems and needs to serve with responsive programming. *See id.* at 1074, JA 137.

The Commission decision to eliminate these procedural ascertainment requirements was premised upon its conclusion that the benefits of such a methodology are far outweighed by the costs:

> We see no continuing reason to burden applicants, licensees or the Commission with detailed inquiries into which or how many community leaders were contacted, by whom, *etc.* * * * [T]he methodological approach to those problems only obscures the issue of responsiveness and exhausts otherwise valuable resources in meaningless minutae [*sic*].

*Report and Order,* 84 FCC2d at 998, JA 61. The Commission decided instead to shift its focus from the mechanics of the ascertainment process to the continuing and unchanged, substantive obligation of licensees to determine community needs and provide responsive programming:

> [W]hat is important is that licensees utilize their good faith discretion in determining the type of programming that they will offer and the issues to which

they will be responsive. It would be inconsistent with the exercise of good faith judgment for a broadcaster to be "walled off" from its community. Rather, broadcasters should maintain contact with their community on a personal basis * *. What is not important is that each licensee follow the same requirements dictating how to do so. * * *

*Id.* The only "paperwork" requirement that remains is for the licensee to prepare annually an issues/programming list, consisting of a brief description of five to ten issues, a statement describing how the licensee determined each issue to be one facing the community, and examples of the programming used to treat the issue.[76]

■ We cannot say that the Commission's decision to eliminate the more formal ascertainment requirements was either arbitrary or capricious. The Commission's policy discretion in this area is quite broad; the Communications Act in no way speaks to the procedures by which licensees must identify the major issues confronting their listenerships. Commission policy has clearly changed over time, and we would hesitate to constrain the Commission's continuing efforts to readjust these policies in light of past experiences. Indeed, this decision would appear simply to restore the regulatory regime in effect prior to the 1971 primer.

Nor has the Commission failed to provide an adequate explanation of the reasons for its decision. After a decade of experience with the ascertainment primers, the Commission decided that the procedures had proven too costly, for both the broadcasters and the regulators. Evidence submitted by broadcasters estimated that the costs for ascertainment ranged from $167 per year to $20,000 per year.[77] The Commission further adjudged that the burden on itself and the legal system was also substantial. Since

---

76. *See Report and Order,* 84 FCC2d at 998–999, JA 61–62. For a further discussion of the issues/programming list, *see* pp. 1438–1442 *infra.*

77. *See id.* at 1077, JA 140. The Council on Wage and Price Stability also submitted evidence, concluding that "[s]ince we know of no convincing evidence indicating that these procedures are effective, and since on the other hand they do impose large costs, we support the Commission's proposal to eliminate them." *Id.*

the adoption of the 1971 primer, the cases dealing with ascertainment had been so numerous that the annotated index of cases alone comprised nearly 60 pages. *See Notice,* 73 FCC2d at 519, JA 257.

Petitioner NAACP claims that the Commission failed to consider the significant benefits of ascertainment and did not make the appropriate findings of fact necessary to support its conclusions. The NAACP appears to misunderstand the court's scope of review in this area. In an informal rulemaking proceeding the Commission is not required to justify its cost-benefit analysis by citing to findings of fact in the record. The decision is more in the nature of a policy judgment that does not require, and indeed is not susceptible of, complete factual support. When the Commission reaches such predictive conclusions about what would best be in the public interest, it is entitled to substantial judicial deference.[78]

Furthermore, the record amply supports the conclusion that the Commission did in fact give adequate consideration to arguments in favor of retaining the requirements, including those of petitioner NAACP.[79] The Commission concluded that the broadcasters, even in the absence of specific procedural ascertainment requirements, would continue to fulfill their basic obligation to identify and program in response to community issues.[80] In addition, the Commission expressed its belief that broadcasters would still respond to issues faced by minority or low-income groups in society. According to the Commission's analysis, these groups represent growing economic forces and attractive new markets for advertisers.[81] Again, it is precisely these types of prognostications that the Supreme Court has deemed "within the institutional competence of the Commission"

and which therefore are entitled to substantial judicial deference. *FCC v. WNCN Listeners Guild, supra,* 450 U.S. at 596, 101 S.Ct. at 1275.

Finally, we do not agree with the NAACP's argument that this movement away from evaluating ascertainment procedures will necessarily force the Commission into closer scrutiny of the content of the issue-responsive programming. Under the prior regulatory regime, the Commission conducted a two-part inquiry, determining first whether the licensee complied with ascertainment procedures to identify community needs and then determining whether the programming presented was responsive to the ascertained needs. Under the new system, the Commission will rely to a greater extent upon the licensee's discretion in identifying community issues, but will still have to determine whether the programming presented was in fact responsive to those issues. In our view, the extent of the Commission's review of program content, and hence the degree of intrusiveness into the protected realm of journalistic discretion, remains constant.

### C. *Commercialization Processing Guidelines*

The only challenge to the elimination of the commercialization processing guidelines is presented by an *amicus curiae,* Public Media Center (PMC). Although this court need not reach any issue not presented by a party to the action, *see Knetsch v. United States,* 364 U.S. 361, 370, 81 S.Ct. 132, 137, 5 L.Ed.2d 128 (1960), we choose to consider this challenge as well, particularly as PMC's argument has been adopted by reference by petitioners NAACP, UCC, and CRC.

In effect since 1973, these guidelines served to cull out those radio license appli-

---

**78.** *See FCC v. WNCN Listeners Guild, supra* note 11, 450 U.S. at 594–595, 101 S.Ct. at 1274; *FPC v. Transcontinental Gas Pipe Line Corp.,* 365 U.S. 1, 29, 81 S.Ct. 435, 450, 5 L.Ed.2d 377 (1961); *NAACP v. FCC, supra* note 21, 682 F.2d at 1001.

**79.** *See generally Report and Order,* 84 FCC2d at 1078–1080, 1083–1090, JA 141–143, 146–153.

**80.** *Id.* at 1083–1088, JA 146–151.

**81.** *See id.* at 1033–1035, JA 96–98 (discussing consumer preferences of groups with low purchasing power).

cations proposing to air generally more than 18 minutes per hour of advertising and to refer them to the full Commission for review. The Commission concluded that the burdens of record-keeping, monitoring, and loss of commercial flexibility were not outweighed by the benefit of the guidelines—control of excessive commercialization. Pointing to the fact that current advertising was far below what the guidelines permitted, the Commission concluded that market forces were more effective in reducing advertising excess than were its own guidelines. *See generally Report and Order,* 84 FCC2d at 1000–1008, JA 63–71.

Essentially, PMC attacks the rationality of this decision. First, PMC claims that the Commission misinterpreted the implications of the statistical data showing that current levels of commercialization are below the guidelines: "[T]his does not prove that marketplace forces serve as a constraint on broadcaster conduct. Rather it is at least as likely that this fact is attributable to the generosity of the guidelines relative to current demand for broadcast time." PMC brief at 20. Even accepting PMC's assumption that one explanation is as likely as the other, the Commission acted well within its discretion by concluding from the record and its own experience that it is the marketplace and not regulation that has kept down the level of commercialization. The Commission hypothesized that since audiences avoid radio stations with excessive advertising, those stations would become less attractive to advertisers, and therefore would lose advertising revenue. Thus, at present and in the future, a self-regulating market mechanism will prevent overcommercialization. *See Report and Order,* 84 FCC2d at 1003–1005, JA 66–68. In the absence of any statutory mandate obligating the Commission to maintain these processing guidelines, this court must give substantial deference to such policy judgments and predictions of future industry behavior.

*See FCC v. WNCN Listeners Guild, supra,* 450 U.S. at 596, 101 S.Ct. at 1275.

PMC also asserts that the Commission's decision will result in reducing the number of public service announcements aired. PMC reasons that since listeners cannot distinguish between these announcement and commercials, the stations will seek to limit the total amount of "clutter" by eliminating the public service messages while retaining the profitable advertisements. We find that the Commission gave adequate consideration to this argument and found it to be speculative. *See Report and Order,* 84 FCC2d at 1107–1108, JA 170–171. Its decision not to accept PMC's analysis was therefore a reasonable exercise of its discretion. *See Action for Children's Television v. FCC,* 564 F.2d 458, 479 (D.C.Cir.1977).

We admit that we are given pause by the Commission's decision never to consider formal challenges to the possibly blatant commercial excesses of any individual station. In the past this court has expressed its concern about excessive commercialization [82]—a concern mirrored in the Commission's own long-standing policies against domination of scarce broadcast time by private advertiser interests. *See Report and Order,* 84 FCC2d at 1091–1093, JA 154–156. The Commission may well find that market forces alone will not sufficiently limit overcommercialization. In that event, we trust the Commission will be true to its word and will revisit the area in a future rulemaking proceeding. *See id.,* 84 FCC2d at 1008, JA 71.

### D. *Programming Logs*

Finally, we must consider the Commission's decision to eliminate the requirement that licensees maintain programming logs and make those logs available to the public. The Commission concluded that the regulatory burden thereby imposed on licensees simply outweighed the value of those logs

---

82. *Business Executives' Move for Vietnam Peace v. FCC,* 450 F.2d 642, 646, 665 (D.C.Cir. 1971), *rev'd sub nom. Columbia Broadcasting*

to the Commission and the public.[83] In lieu of the programming logs, licensees will be required to place in their public files an annual "issues/programs list," enumerating from five to ten issues of concern to the community and providing examples of the programs aired in an effort to address those issues. *See Report and Order,* 84 FCC2d at 999, JA 62. This issues/programs list will be the only record of programming still available in a station's file. *Id.* at 971, JA 34.

■ Nothing in the Communications Act explicitly compels the Commission to retain the programming logs requirements. Indeed, the only reference to record-keeping in the Act seems to vest complete discretion with the Commission. Section 303(j) authorizes the Commission "to make general rules and regulations requiring stations to keep such records of programs, transmissions of energy, communications, or signals *as it may deem desirable.*"[84] Nevertheless, for almost 50 years the Commission has chosen to exercise this discretion by requiring comprehensive program logs. The elimination of such a long-standing policy thus prompts this court to scrutinize more closely the Commission's proffered explanations for its actions. *See Greater Boston Television Corp. v. FCC, supra,* 444 F.2d at 852. After thoroughly examining the record, we find the Commission's reasoning and analysis to be inadequate. In particular, we believe that the Commission failed to give sufficient consideration to the benefits of retaining a modified form of programming logs more appropriate to the informational needs of the new regulatory scheme established in this and concurrent rulemaking proceedings.

The Commission premised its decision to eliminate the logging requirements upon a straightforward cost-benefit analysis.

First, the logs were found to constitute a "tremendous record-keeping burden." For supporting evidence, the Commission cites to a recent General Accounting Office (GAO) study on federal paperwork requirements which concluded that the radio stations' compliance with the logging rules involves 18,233,940 hours per year.[85] Next, the Commission notes the low remaining marginal utility of these logs in light of its decisions to eliminate the nonentertainment programming and commercialization guidelines and to reorient its focus to issue-oriented programming. As the Commission explains:

> While logs would have revealed the type, time, and duration of programming, they would not necessarily have provided a scintilla of information relative to the specific content of the programming. The type of information that they provided was chiefly that sort of information of value in assessing compliance with the guidelines. As those guidelines are now eliminated the minimal usefulness of logs to the public and the Commission has become substantially outweighed by their costs. * * *

*Reconsideration Order,* 87 FCC2d at 809, JA 13. Finally, the Commission emphasized its "continued reliance on the public file as an index to the general programming responsibility of licensees." *Report and Order,* 84 FCC2d at 1010, JA 73. The new requirement that the public file contain an annual issues/programs list will provide information as to from five to ten issues addressed by the station's programming and the time and duration of these exemplary offerings. In the Commission's view, this and other available information will suffice to enable it and the public to oversee the general public interest responsibilities of licensees.

*System, Inc. v. Democratic Nat'l Committee, supra* note 37.

83. *See Report and Order,* 83 FCC2d at 1008–1010, JA 71–73; *Reconsideration Order,* 87 FCC2d at 809, JA 13.

84. 47 U.S.C. § 303(j) (1976) (emphasis added).

85. *See Report and Order,* 84 FCC2d at 1009, JA 72. The Commission also makes passing reference to other "costs" inherent in the current system of logging. The regulations' specificity is said to create undue concern with "technical compliance" and to inhibit the development of more modern and efficient means of record-keeping. *See id.*

██ Unfortunately, we cannot accept either the Commission's reasoning or its conclusions in this area. Our objections are not that the Commission somehow "miscalculated" the costs and benefits of regulating the record-keeping systems of licensees.[86] Such cost-benefit analyses epitomize the types of decisions that are most appropriately entrusted to the expertise of an agency; certainly appellate briefs and arguments would ill-equip a court that would seek to balance for itself the myriad considerations involved in any complex administrative policy decision.[87] Within our legitimate purview, however, do fall both the duty and the ability to ensure that an agency has at least understood the relevant factors to be considered and has provided an adequate explanation of its reasoning process.[88] In our opinion, the Commission's decision to eliminate the program log requirement fails to survive this scrutiny.

The fundamental problem is the Commission's complete failure to examine in an orderly fashion the informational needs created by its revised scheme and the possible ways in which those needs may be met. Instead of addressing this crucial and basic question, the Commission engages in a highly restrictive justification for its decision to eliminate the current logging requirements. For example, the Commission essentially argues that because certain quantitative guidelines have been eliminated, the information elicited by the logs is no longer relevant; therefore, the logs themselves can also be eliminated. This reasoning is unsound. Of course, a logging requirement designed to make available certain information relevant under one regulatory scheme will seem useless and expendable if transplanted unchanged to a new regulatory scheme.

The relevant question thus should be whether a *revised* comprehensive logging requirement—one designed, for example, to log information about *issues* and not *categories* of programming—might not produce benefits that would outweigh the record-keeping costs. Yet the Commission never even considered this alternative. While we appreciate that the Commission is not required to consider every possible policy option,[89] nevertheless we believe that the Commission's failure to examine and compare the relative usefulness of revised program logs and the issues/programs lists warrants a remand in this case.[90]

Moreover, the Commission's explanation of the new scheme is inadequate. Nowhere can we find a focused discussion of the new information needs created by the substantive regulatory changes or even an explanation of how the unchanged needs will be met without access to some type of programming logs. The Commission appears to believe that the new issues/programs list will suffice to inform the public about the public interest programming of radio licensees. Yet, petitioners have presented a

---

86. For example, petitioner NAACP argues for a remand on grounds that: (1) the Commission apparently relied on the GAO study which, according to the Commission itself, *see id.*, "highly exaggerated" the costs of the logging requirements; and (2) the Commission apparently failed to appreciate the distinction between the costs of record-keeping necessitated by ordinary business purposes and those marginal costs involved in complying with Commission requirements. As legitimate as these contentions might be, our power to contest the rationality of the substantive decisions of the Commission is strictly limited. *See Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council, Inc., supra* note 11.

87. *See generally* Stewart & Sunstein, *Public Programs and Private Rights*, 95 Harv.L.Rev. 1193, 1275–1278 (1982); DeLong, *Informal Rulemaking and the Integration of Law and Policy*, 65 Va.L.Rev. 257 (1979).

88. *See, e.g., FCC v. Nat'l Citizens Committee for Broadcasting, supra* note 19, 436 U.S. at 803, 98 S.Ct. at 2116; *Citizens to Preserve Overton Park, Inc. v. Volpe, supra* note 30, 401 U.S. at 416, 91 S.Ct. at 823. For a more complete exposition of this standard of review, *see* pp. 1424–1426 *supra*.

89. *See, e.g., Consumers Union of the United States Inc. v. CPSC*, 491 F.2d 810, 812 (2d Cir.1974).

90. *See State Farm Mutual Auto. Ins. Co. v. Dep't of Transportation, supra* note 27; *Nat'l Citizens Committee for Broadcasting v. FCC, supra* note 30, 567 F.2d at 1110–1115.

strong case that both the concerned citizen and the concerned Commissioner will find the issues/programs list to be a woefully insufficient substitute for program logs.

In *Office of Communication of United Church of Christ v. FCC,* this court made clear the crucial right of citizens to participate in the review of a station's public interest performance at renewal time. We pointed out:

> The theory that the Commission can always effectively represent the listener interests * * * is no longer a valid assumption which stands up under the realities of actual experience * * *.
>
> \*　　\*　　\*　　\*　　\*　　\*
>
> * * * In order to safeguard the public interest in broadcasting, therefore, we hold that some 'audience participation' must be allowed in license renewal proceedings. * * * [91]

█ The public thus possesses an unassailable right to participate in the disposition of valuable public licenses, free of charge, to "public trustees." [92] We will not allow this right to be undermined indirectly by the Commission's inadequately explained refusal to require licensees to make available information on their issue-responsive programming. Citizen groups in the past have found the program logs to be essential to obtain the concrete information necessary to demonstrate a radio station's inadequate performance in a petition to deny. [93] Under the Commission's current rules, a citizen seeking to support his petition to deny based on a station's inadequate nonentertainment programming would now find very little information of any value in the station's public file. The issues/programs list would provide only illustrative examples of certain issue-oriented programs; there appears to be no way, short of constant monitoring, to gauge a station's *overall* public service performance. [94] Such a dearth of information is hardly conducive to encouraging the public participation envisioned by the Congress and by this court as essential to the formulation of an informed regulatory policy.

We also find the Commission's decision to eliminate the logs to be seriously disturbing in light of its concurrent proceeding to adopt a simplified renewal procedure. [95] This proposed renewal scheme would place near-total reliance on petitions to deny as the means to identify licensees that are not fulfilling their public interest obligations. That the Commission would simultaneously seek to deprive interested parties and itself

---

91. 359 F.2d 994, 1003–1004, 1005 (D.C.Cir. 1966). On the growing importance of citizen participation in a variety of administrative settings, *see* Cramton, *The Why, Where and How of Broadened Public Participation in the Administrative Process,* 60 Geo.L.J. 525 (1972); Gellhorn, *Public Participation in Administrative Proceedings,* 81 Yale L.J. 359 (1972).

92. *Columbia Broadcasting System, Inc. v. Democratic Nat'l Committee, supra* note 37, 412 U.S. at 117, 93 S.Ct. at 2093.

93. Petitioners UCC and CRC provide an extensive listing of cases in which the petitions to deny relied extensively on the logs. *See* UCC and CRC brief at 29. Other commentators support this view. *See generally* J. Grundfest, Citizen Participation in Broadcast Licensing Before the FCC (1976); Comment, *Enforcing the Obligation to Present Controversial Issues: The Forgotten Half of the Fairness Doctrine,* 10 Harv.Civil Rights-Civil Lib.L.Rev. 137, 168–170 (1975).

94. The Commission doggedly insists in its discussion of program logs that the absolute amount of nonentertainment programming aired has become "irrelevant" in light of its decision to eliminate the nonentertainment programming processing guidelines. We continue to believe that the Commission· has simply overstated its intent to deemphasize the quantity issue. *See* pp. 1432–1434 *supra.* Clearly, a citizen could believe that a station was providing a grossly inadequate amount of such programming and could seek to file a petition to deny on that and other grounds. She would find, however, that the issues/programming list in the public file would not provide any information about the station's nonentertainment programming beyond those examples of programs that the station chose to list—the total duration of which could easily be one hour or less.

95. *See Renewal of License,* 46 Fed.Reg. 26236 (1981), *appeal pending sub nom. Black Citizens for a Fair Media v. FCC,* D.C.Cir. Nos. 81–1710, 81–2277.

of the vital information needed to establish a *prima facie case* [96] in such petitions seems almost beyond belief.

Even more critical perhaps is the Commission's apparent failure to consider the problem of overseeing its partial deregulation of radio without the information contained in those logs. We have upheld the authority of the Commission to revise quite drastically its view of the public interest and the means by which it may be achieved. Throughout these proceedings, the Commission has made policy judgments that are essentially predictions of future licensee and market behavior. The Commission consistently stressed that if the consequences of this particular deregulation are not as predicted, it will "revisit the area and take appropriate action in another rulemaking proceeding." *See, e.g., Report and Order,* 84 FCC2d at 1008, JA 71. In a section entitled "Monitoring Deregulation," the Commission further emphasized that "[t]he steps we are taking here in no way will reduce our responsibility, *ability,* and determination to provide a regulatory framework that assures radio broadcast programming in the public interest." *Id.* at 1011, JA 74 (emphasis added).

We are not persuaded by this unsupported assertion that the Commission will be capable of monitoring its deregulation once radio licensees are no longer required to keep track of their nonentertainment programming. Ironically, much of the data that formed the basis for the very decision to deregulate came from compilation of information available only from the logs. *See, e.g., Notice,* 73 FCC2d at 560–565, 572–580, JA 298–303, 310–318. Despite the Commission's conclusory assurances, this court does not understand, for example, where the Commission will obtain information to confirm its prediction that adequate amounts of nonentertainment programming will continue on radio. The Commission may not rely today on predictive judgments, while simultaneously foreclosing its, and the public's, ability tomorrow to assess the accuracy of those predictions.[97]

Elimination of program logs may well affect the entire regulatory scheme in other ways as well. The preceding discussion exemplifies the extent of our concern and the limits of our knowledge. The Commission has simply failed to provide a sufficiently coherent justification for the elimination of the logs. We remand this portion of the orders so that the Commission may revisit the entire question of what information regarding radio nonentertainment programming must be made available to the public and to the Commission for the proper functioning of the new regulatory scheme. In spite of the profit these free franchises generate, it is understandably appealing to seek a reduction in the costly paperwork burden of licensees. However, the Commission has failed to give adequate consideration to the vital information role that the logging requirements presently serve in the overall scheme of the Communications Act.

## V. Conclusion

A few years ago we noted the "rising tide of deregulation" that was sweeping the country in general and the broadcast industry in particular.[98] Since that time, the tide

---

**96.** For the evidentiary showing needed to support a successful petition to deny, *see* 47 U.S.C. § 309(d) (1976).

**97.** In a somewhat analogous deregulation case, the Supreme Court upheld the Federal Power Commission's decision to exempt small producers from certain regulations. However, the Court carefully noted "the Commission's intention to keep the experiment under close review." *FPC v. Texaco Inc.,* 417 U.S. 380, 392–393, 94 S.Ct. 2315, 2323–2324, 41 L.Ed.2d 141 (1974). Similarly, the Communications Com-

mission must monitor the effects of its own experiment in deregulation. As was stated in *Nat'l Broadcasting Co. v. United States, supra* note 17, 319 U.S. at 225, 63 S.Ct. at 1013: "If time and changing circumstances reveal that the 'public interest' is not served by application of the Regulations, it must be assumed that the Commission will act in accordance with its statutory obligations."

**98.** *Office of Communication of United Church of Christ v. FCC,* 590 F.2d 1062, 1069 (D.C.Cir. 1978).

has become a tidal wave,[99] and the Commission has become one of the foremost advocates of across-the-board deregulation for the entire broadcast industry.[100]

In these proceedings the Commission has on its own undertaken to enact a significant deregulation of the radio industry. In so doing it has pushed hard against the inherent limitations and natural reading of the Communications Act. For the reasons stated above, we affirm most of the Commission's orders, remanding only those portions relating to program logs with instructions that the Commission undertake further inquiry in accordance with this opinion. However, we take this opportunity to note that Congress, and not the Commission, may be the more appropriate source of such significant deregulation. It was Congress, after all, that created and oversaw the evolution of the original regulatory scheme for radio and television licensees. It should thus be Congress, and not the unrepresentative bureaucracy and judiciary, that takes the lead in grossly amending that system, thereby providing the public with a greater voice in this important process.[101] And yet, in the absence of more specific congressional direction, we cannot say that the Commission has overstepped either the bounds of its statutory authority or its administrative discretion in undertaking most of the deregulatory actions under review.

*Affirmed in part and remanded in part.*

BORK, Circuit Judge, concurring:

I write in concurrence to address two points. First, I wish to clarify my understanding of a portion of Judge Wright's excellent opinion for the court. We remand on the issue of program logs so that the Commission may reexamine the matter and provide a more thoughtful and detailed justification of whatever decision it may reach. Judge Wright's discussion forcefully raises several questions for the Commission on remand. I do not read the opinion as intimating any preconceptions as to the Commission's new decision, nor do I take it to suggest a disposition of any other pending case. Second, I express no view either way concerning the opinion's last paragraph, which speaks to the limits of the Commission's powers and the desirability of congressional action.

---

**99.** *See generally* Gellhorn, *Deregulation: Delight or Delusion?*, 24 St. Louis U.L.J. 469 (1980); Note, *The Proposed Communications Act Rewrite: Potomac Deregulatory Fever v. The Public Interest,* 45 Cincinnati L.Rev. 467 (1979).

**100.** *See generally* Fowles & Brenner, *A Marketplace Approach to Broadcast Regulation,* 60 Tex.L.Rev. 207 (1982).

**101.** *Cf. Citizens Communications Center v. FCC,* 447 F.2d 1201, 1209–1210 (D.C.Cir.1971).