779 F.2d 702
 250 U.S.App.D.C. 312
 OFFICE OF COMMUNICATION Of the UNITED CHURCH OF CHRIST, Petitioner,
v.
FEDERAL COMMUNICATIONS COMMISSION and United States of
America, Respondents,
National Association of Broadcasters, National Radio
Broadcasters Association, CBS, Inc., NAACP et al.,
and American Broadcasting Companies,
Inc., Intervenors.
 No. 84-1239.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued Sept. 26, 1985.
Decided Dec. 20, 1985.
 
 Petition for Review of an Order of the Federal Communications commission.
 Henry Geller, with whom Donna Lampert, Washington, D.C., was on the brief, for petitioner. Donna A. Demac, New York City, entered an appearance for petitioner.
 Daniel M. Armstrong, Associate Gen. Counsel, F.C.C., with whom J. Paul McGrath, Asst. Atty. Gen., Jack D. Smith, Gen. Counsel, and C. Grey Pash and Jane E. Mago, Counsel, F.C.C., and John J. Powers, III and Frederic Freilicher, Attys., Dept. of Justice, Washington, D.C., were on the brief, for respondents.
 Timothy B. Dyk, with whom J. Roger Wollenberg and Philip D. Anker (for CBS, Inc.), Henry L. Baumann and Barry D. Umansky, Washington, D.C. (for Nat. Ass'n of Broadcasters), and Thomas Shottenfield and Mania K. Baghdadi, Washington, D.C., (for Nat. Radio Broadcasters Ass'n), were on the joint brief for intervenors CBS, Inc., Nat. Ass'n of Broadcasters, and Nat. Radio Broadcasters Ass'n. Susan A. Marshall, Washington, D.C., entered an appearance for intervenor Nat. Radio Broadcasters Ass'n.
 Carl R. Ramey, Washington, D.C., entered an appearance for intervenor American Broadcasting Companies, Inc.
 Wilhelmina Reuben Cooke and Barbara Shufro, Washington, D.C., entered appearances for intervenor NAACP et al.
 Before WRIGHT, MIKVA and GINSBURG, Circuit Judges.
 Opinion for the court filed by Circuit Judge J. SKELLY WRIGHT.
 J. SKELLY WRIGHT, Circuit Judge:
 
 
 1
 Petitioner challenges an order of the Federal Communications Commission (FCC) revising its regulations governing the contents of the public files of commercial radio broadcasters. The new rule requires broadcast licensees to maintain a list of at least five to ten community issues addressed by the station's programming during each three-month period. This new rule was enacted pursuant to our remand in Office of Communication of United Church of Christ v. FCC, 707 F.2d 1413 (D.C.Cir.1983) (UCC III). Our remand was predicated on the FCC's failure to explain adequately its replacement of its logging requirements with an illustrative issues/programs list. We were concerned that the FCC's new rule left the public with insufficient information to evaluate the programming of broadcast licensees. Id. at 1442. Unfortunately, the FCC's latest effort provides only cosmetic improvements on its previous design. As in UCC III, we find that a merely illustrative issues/program list does not further the Commission's stated regulatory goal of relying on effective public participation in the license renewal process. Id. at 1441. Moreover, the Commission has failed to provide an adequate explanation for its rejection of an alternative proposal, duly submitted during the notice and comment proceedings, that would advance its stated goal. We therefore vacate the Commission's order as arbitrary and capricious and remand the case for further proceedings.
 
 BACKGROUND
 
 2
 In 1981 the FCC initiated a sweeping deregulation of the radio industry. Specifically, it (1) deleted guidelines encouraging radio licensees to present a certain quantity of nonentertainment programming responsive to community needs, (2) abolished the ascertainment procedures by which the licensees identified community needs, (3) eliminated guidelines that limited the amount of broadcast time devoted to commercials, and (4) repealed the requirement that radio stations maintain program logs that recorded information about each program or commercial aired during the broadcast day. See Report and Order, Deregulation of Radio, 84 FCC2d 968 (1981) (First Report). At about the same time the FCC moved to simplify its license renewal process, replacing its previous long application forms with a "postcard" application. See Radio Broadcast Services: Revision of Applications for Renewal of License of Commercial and Noncommercial AM, FM, and Television Licensees, 49 Rad.Reg.2d (P & F) 740 (1981) (Renewal Decision).
 
 
 3
 The FCC's salutary purpose in enacting this deregulatory program was to reduce the paperwork burden borne by licensees. Renewal Decision, 49 Rad.Reg.2d at 742-743; First Report, 84 FCC2d at 1009. Mindful that the Commission has ample discretion to articulate policy within the broad framework of the Communications Act, we upheld the bulk of these changes when they were challenged before this court. In Black Citizens For A Fair Media v. FCC, 719 F.2d 407 (D.C.Cir.1983), cert. denied, --- U.S. ----, 104 S.Ct. 3545, 82 L.Ed.2d 848 (1984), we upheld the new streamlined renewal process. In UCC III this court upheld the elimination of the ascertainment requirements, the minimum nonentertainment programming requirement, and the limit on commercials. 707 F.2d at 1435, 1436, 1438.[1]
 
 
 4
 The public file regulation, however, presented special difficulties. In its First Report the FCC had eliminated the requirement that licensees maintain a log of every program aired. Instead, the Commission merely required licensees to provide an annual "issues/programs list." This list would enumerate five to ten issues of concern to the community and provide examples of the programs presented in efforts to address those issues. First Report, 84 FCC2d at 999. In evaluating this rule we noted that the agency's stated goals required a more comprehensive recordkeeping requirement. Specifically, we noted that the FCC's new faith in voluntary public participation could only function effectively if the public were assured an adequate flow of information. Id. at 1441-1442. We then found that the Commission had failed to provide an adequate explanation of its new recordkeeping regulations and remanded the issue to the FCC.
 
 
 5
 On remand the Commission issued a Further Notice of Proposed Rulemaking, 48 Fed.Reg. 33499 (July 22, 1983), raising the question of what information licensees should make available. When the Commission issued its new order, however, it once more endorsed the concept of a merely illustrative issues list. See Report and Order, Deregulation of Radio, 96 FCC2d 930 (1984) (Second Report ), Joint Appendix (JA) 9. The new regulation, 47 C.F.R. Sec. 73.3526(a)(10) (1984), reads in pertinent part:
 
 
 6
 [Every permittee or licensee of an AM or FM station shall maintain for public inspection a file into which the permittee or licensee will insert [,] every three months[,] a list of at least 5 to 10 community issues addressed by the station's programming during the preceding 3 month period. The list is to be filed the first day of each calendar quarter * * *. The list shall include a brief narrative describing how each issue was treated, i.e., public service announcements or programs, giving a description of the programs including time, date and duration of each program. * * *Thus the Commission did not merely reinstitute the rule that we found inadequate in UCC III. Instead of an annual report the Commission now requires quarterly reports. And instead of establishing a maximum of 10 issues, the new rule leaves licensees free to determine the maximum number of issues on which they wish to report. The five-issue minimum, however, was retained. See Second Report, 96 FCC2d at 941 para. 28, JA 19-20.
 
 
 7
 Petitioner United Church of Christ challenges the Commission's revised recordkeeping requirement as arbitrary and capricious. We sustain that challenge.
 
 I. EXHAUSTION
 
 8
 As an initial matter, the FCC argues that petitioner is barred from challenging 47 C.F.R. Sec. 73.3526(a)(10) because petitioner failed to participate in the agency's proceedings on remand. In support of this contention the Commission cites 47 U.S.C. Sec. 405 (1982), which provides in pertinent part:
 
 
 9
 * * * The filing of a petition for reconsideration shall not be a condition precedent to judicial review of any [FCC] order, decision, report, or action, except where the party seeking such review (1) was not a party to the proceedings resulting in such order, decision, report, or action, or (2) relies on questions of fact or law upon which the Commission, or designated authority within the Commission, has been afforded no opportunity to pass.
 
 
 10
 In Joseph v. FCC, 404 F.2d 207, 209 (D.C.Cir.1968), this court construed Section 405(1) to "provide[ ] that to be eligible to seek judicial review of a Commission order, one either must have been a party to the proceedings resulting in the order, or must have petitioned for reconsideration of the order." See also Southwestern Publishing Co. v. FCC, 243 F.2d 829 (D.C.Cir.1957).
 
 
 11
 In our case petitioner neither participated in the remand proceedings nor sought reconsideration of the FCC's order. Nonetheless, because other parties who did participate in the notice and comment proceeding below raised the same arguments petitioner now pursues on appeal, we find that Section 405 does not bar petitioner from pressing its argument before this court.
 
 
 12
 The leading case in this circuit construing Section 405 is Washington Ass'n for Television & Children [WATCH] v. FCC, 712 F.2d 677 (D.C.Cir.1983). In that case Judge Wald observed:
 
 
 13
 The cases assume that Sec. 405 contains implied exceptions without explaining why. We understand these cases, however, as implicitly interpreting Sec. 405 to codify the judicially created doctrine of exhaustion of administrative remedies, which permits courts some discretion to waive exhaustion. There is no useful legislative history to confirm or refute this interpretation, but it has the merit of requiring the same degree of exhaustion for the FCC as for other agencies. We adopt that interpretation here and thus construe Sec. 405 to incorporate the traditionally recognized exceptions to the exhaustion doctrine.
 
 
 14
 Id. at 681-682 (footnotes omitted). See also Action for Children's Television v. FCC, 564 F.2d 458, 469 (D.C.Cir.1977) (Sec. 405 " 'leaves room for the operation of sound judicial discretion to determine whether and to what extent judicial review of questions not raised before the agency should be denied.' " (quoting Great Falls Community TV Cable Co. v. FCC, 416 F.2d 238, 239 (9th Cir.1969)).
 
 
 15
 In WATCH v. FCC, supra, Judge Wald noted that one of the established exceptions to the exhaustion doctrine in general, and therefore to Section 405 in particular, was where another party raised the same issue that a petitioner subsequently raises on appeal. Thus she stated: "[I]t is not always necessary for a party to raise an issue, so long as the Commission in fact considered the issue." 712 F.2d at 682.[2]
 
 
 16
 It is true that WATCH construed the clause in Section 405 requiring presentation of issues to the Commission before they are raised before a reviewing court (clause (2)). Our case, on the other hand, implicates the clause of Section 405 requiring the parties to participate in proceedings before the agency before they seek judicial review of the agency's actions (clause (1)). Nonetheless, the conclusion of this court in WATCH that Section 405 simply codifies the common law exhaustion requirement would seem to apply to our case as well. The relevant legislative history is not more explicit regarding clause (1) than it is regarding clause (2).[3] Moreover, our cases have held that clauses (1) and (2) should both be interpreted flexibly in light of their (identical) underlying purpose: to make sure that the agency has adequate opportunity to consider the issues before they are considered by a reviewing court. Compare Joseph v. FCC, supra, 404 F.2d at 210 (noting that clause (1) was not to be construed "mechanically" but rather in light of its purpose of providing notice of the relevant issues to the Commission), with WATCH v. FCC, supra, 712 F.2d at 681 (making the same observation in connection with clause (2)).
 
 
 17
 It would therefore seem that the exception to clause (2) of Section 405 enunciated in WATCH v. FCC, supra, 712 F.2d at 682--that Section 405 does not bar review where the Commission has received notice of the party's claim--applies to clause (1) of Section 405 as well. A review of the comments submitted to the agency and the arguments presented on appeal indicates that our case falls squarely within this exception. Commenters Geller and Lampert raised substantially the same argument in the notice and comment procedure that UCC now raises on appeal.[4] We therefore conclude that Section 405 does not preclude review in this case.[5]
 
 II. THE MERITS
 
 18
 There is no question but that the Commission has the statutory authority to require whatever recordkeeping requirements it deems appropriate.[6] Review therefore proceeds under the "arbitrary and capricious" standard. Particularly because this is an instance of administrative change in policy, this court must scrutinize the agency's actions to ensure that the Commission has rationally considered significant alternatives. See Motor Vehicle Manufacturers Ass'n v. State Farm Mutual Auto. Ins. Co., 463 U.S. 29, 46, 103 S.Ct. 2856, 2868, 77 L.Ed.2d 443 (1983). Rational decisionmaking also dictates that the agency simply cannot employ means that actually undercut its own purported goals. See UCC III, 707 F.2d at 1441-1442. The Commission's action in this case fails to pass muster under either of these criteria.
 
 
 19
 A. The Irrationality of an Illustrative Issues List
 
 
 20
 1. The role of the public file regulations in the current regulatory scheme. In our case the requirement that the agency's means not undermine its purported goals translates into a requirement that the FCC's rules governing the content of licensees' public files not contradict its stated policy of relying on public participation in the license renewal process. The agency relies, at least in part, on public participation in the form of petitions to deny to ensure that applicants for license renewal have met their public interest obligations under 47 U.S.C. Sec. 309(a) (1982). See Renewal Decision, 49 Rad.Reg.2d at 747 para. 27; Black Citizens For A Fair Media v. FCC, supra, 719 F.2d at 414.[7]
 
 
 21
 The Communications Act, 47 U.S.C. Sec. 309(d)(1) (1982), requires a petitioner seeking to deny a license renewal to bear the burden of making a prima facie case indicating that the licensee has failed to meet its public interest responsibilities under the Act. In making a prima facie case a petitioner must file affidavits making "substantial and specific allegations of fact which, if true, would indicate that a grant of the application would be prima facie inconsistent with the public interest." Stone v. FCC, 466 F.2d 316, 322 (D.C.Cir.1972). As the legislative history of Section 309(d) indicates, mere "conclusory" or "general" allegations concerning the ultimate issues contested by the petition are not enough. S.Rep. No. 690, 86th Cong., 1st Sess. 3 (1959). See also H.R.Rep. No. 1800, 86th Cong., 2d Sess. 12 (1960).
 
 
 22
 After the petitioner has filed its affidavits, the applicant for renewal can file counter-affidavits. 47 U.S.C. Sec. 309(d)(1) (1982). After considering such counter-affidavits, the Commission must determine whether there is a "substantial and material question of fact" concerning the adequacy of the applicant's programming. Only if it finds such a significant dispute on this ultimate issue will it order a hearing. 47 U.S.C. Sec. 309(d)(2) (1982). Finally, whether or not an evidentiary hearing is held, the Commission must make an ultimate determination of whether the facts establish that the public interest will be served by granting or denying the broadcaster's application for renewal of its license. See Citizens for Jazz on WRVR, Inc. v. FCC, 775 F.2d 392, 394 (D.C.Cir.1985).
 
 
 23
 Exactly, what constitutes a violation of the public interest standard in general or the community issue programming test in particular is largely committed to the discretion of the agency. In UCC III, however, this court found that a petitioner to deny must show that the "overall" programming efforts of a licensee had failed to adequately respond to issues of community concern. 707 F.2d at 1441. On remand the Commission refined this point by noting that "the proper inquiry into a broadcaster's performance will be centered on its efforts to program in response to those issues it deems important rather than all issues included in the broadcast schedule." Second Report, 96 FCC2d at 939 para 21, JA 16 (emphasis in original). Thus to make a prima facie case a petitioner to deny must file affidavits alleging specific facts which, if established, would show that the "overall" programming efforts of the applicant failed to include adequate treatment of those issues of public concern chosen by the applicant itself.
 
 
 24
 Petitioner argues that for all practical purposes the issues list will be the sole basis for building a prima facie case in a petition to deny. Brief for petitioner at 16. Petitioner's argument is supported by this court's observation that the new streamlined renewal process "is premised, in part, on the Commission's belief that sufficient information is available in the public file" to facilitate petitions to deny. Black Citizens For A Fair Media v. FCC, supra, 719 F.2d at 414 n. 16. See also UCC III, 707 F.2d at 1441 ("Citizen groups in the past have found the program logs to be essential to obtain the concrete information necessary to demonstrate a radio station's inadequate performance in a petition to deny."). Similarly, in enacting the new postcard renewal system the Commission itself stressed the importance of the public file in its new regulatory scheme:
 
 
 25
 Under the rules and policies adopted herein, the information necessary to conduct an in-depth review of a licensee's performance will be available at the station in the public inspection file. Interested citizens need only visit that file to avail themselves of the information necessary to support a complaint or petition to deny, should one be appropriate. * * * Our concerns for assuring the ability of local citizens to monitor the operations of licensees who serve them are fulfilled by maintenance of local public files. * * *
 
 
 26
 Renewal Decision, 49 Rad.Reg.2d at 747 para. 26.
 
 
 27
 On remand the Commission was even more explicit on this point. It noted that the issues/programs list was the critical component of the public file. Thus in the Second Report the Commission observed: "[T]he most significant source of issue-responsive information under the new regulatory scheme will be the issues/programs list." 96 FCC2d at 940 para. 24, JA 17.
 
 
 28
 The FCC now suggests, however, that where the public file of an applicant was inadequate to resolve "substantial" issues of fact the petitioner could always ask the Commission to use its power to obtain additional information from the licensee. See Second Report, 96 FCC2d at 940 para. 25, JA 17. Under this theory the lists need merely provide enough information so that a petitioner to deny can make an intelligent choice among various licensees; they need not provide the basis for a prima facie case.
 
 
 29
 Such reasoning puts the cart before the horse. A petitioner will simply be unable to demonstrate that such a "substantial" factual issue exists absent adequate information in the public file.[8] Moreover, should the Commission decide to make liberal use of its power to compel supplemental information from licensees, notwithstanding the flimsy character of a petition to deny, we have grave doubts about whether such a policy could withstand legal challenge, for in passing Section 309(d) Congress specifically sought to stop the Commission from allowing members of the public to harass licensees with baseless allegations. See WLVA, Inc. (WLVA-TV), Lynchburg, Va. v. FCC, 450 F.2d 1286, 1293 (D.C.Cir.1972).[9]
 
 
 30
 The FCC also suggests that under its revised regime citizen groups might resort to private monitoring of the radio spectrum. See Second Report, 96 FCC2d at 940-941 para. 26, JA 17-18. Incredibly, the Commission cites UCC III in support of this alternative means of documenting petitions to deny. See id. at 940, JA 17. A close reading of our opinion, however, clearly indicates that this court thought that reliance on such private monitoring was "beyond belief." UCC III, 707 F.2d at 1441-1442.[10]
 
 
 31
 If the Commission's goal is public participation in the license renewal process, the least it can do is assure that public files contain the minimum amount of information required to begin the process outlined in 47 U.S.C. Sec. 309(d) (1982). The threshold requirement of that section is that the petitioner make a prima facie case. Indeed, enabling a petitioner to deny the ability to make a prima facie case is to ensure very little. The FCC retains the authority under 47 U.S.C. Sec. 309(d)(2) to refuse to grant a hearing even where a petitioner has satisfied the prima facie case requirements of 47 U.S.C. Sec. 309(d)(1). And even a petitioner to deny who has obtained a hearing is still far from a victory on the merits. Our decision today has not the slightest effect on the Commission's discretionary authority to deny hearings or renew licenses. See Citizens for Jazz on WRVR, Inc. v. FCC, supra, 775 F.2d at 394. But if the Commission's decision that public participation is a vital element of its new renewal policy is to be taken seriously, the Commission cannot make it virtually impossible for members of the public to participate at the most elementary level of a Section 309(d) proceeding.
 
 
 32
 In sum, we conclude that the petition to deny plays a critical role in the current regulatory scheme. Moreover, we believe that an adequate public file is essential to proper functioning of the procedures governing the petition to deny. Specifically, the agency's public file requirements must be sufficient to enable a petitioner to make a prima facie case under 47 U.S.C. Sec. 309(d)(1). The current public file regulations do not meet this test.
 
 
 33
 2. The inadequacy of the illustrative issues/program list. As noted, the illustrative issues lists identify the issues covered by a station and describe how the station treated each issue, including specific examples of programs responsive to each issue. The lists must also identify the time, date, and duration of broadcast for each program listed. By the time a license comes up for renewal, there will be 28 quarterly lists available. Although such lists will therefore contain a non-trivial quantity of data, they will not assure a petitioner to deny the ability even to come close to making a prima facie case.
 
 
 34
 (a) Ripeness and the inflexibility of the prima facie case requirment. Before proceeding to the merits of the illustrative issues/programs list, we must pause to consider a prudential argument against our considering this question at this time. Both respondents and intervenors argue that even if the current scheme effectively thwarts enforcement of the public interest requirement of Section 309(a), that issue should be litigated in the context of an actual FCC dismissal of a petition to deny. Their argument rests on the Commission's ability to redefine the requirements of a prima facie case. See brief for respondents at 15; joint brief for intervenors CBS, Inc. et al. at 24. The statutory definition of the prima facie case requirement, however, vitiates this argument and suggests that our analysis is not premature.
 
 
 35
 In Stone v. FCC, supra, Judge Wilkey found that the heavy burden entailed in making a prima facie case under Section 309(d) was specifically mandated by Congress when it amended Section 309 in 1960. 466 F.2d at 322. Similarly, in WLVA, Inc. (WLVA-TV), Lynchburg, Va. v. FCC, supra, this court found that the very creation of the device of the petition to deny was
 
 
 36
 in large part a congressional response to the liberality with which the Commission had granted hearings in the past. The new, more rigorous provisions were considered a "marked improvement over the existing statutory provision * * * which [had] been interpreted by the Commission to permit allegations to be made on information and belief. * * * "
 
 
 37
 459 F.2d at 1293 (quoting H.R.Rep. No. 1800, 86th Cong., 2d Sess. 11 (1960), U.S.Code Cong. & Admin.News 1960, p. 3519 (ellipsis and brackets by the WLVA court)).[11]
 
 
 38
 Of course, the Commission does have some flexibility. For example the FCC could, and did, eliminate the requirement that petitions to deny include conclusive quantitative analysis of an applicant's issue-responsive programming. Cf. UCC III, 707 F.2d at 1433 (conceding that the FCC was free to " 'downplay' the significance of absolute numbers of minutes or percentages of broadcast time"). Similarly, the Commission will have some latitude in determining the types of programs that will be considered adequate to meet a broadcaster's public interest obligations. See id. at 1431. But the Commission does not have the freedom to violate the command of Section 309(d) as applied to the issue of community-responsive programming: the petitioner to deny must introduce affidavits alleging specific facts which, if established, indicate that the overall performance of the licensee was so defective as to raise a substantial question whether renewal of its license is consistent with the public interest.[12]
 
 
 39
 Given this rather inflexible standard, we do not believe our consideration of the effect of the Commission's public record requirements is in any sense premature or based on "mere speculation." Brief for respondents at 15. We therefore turn to analyze the rationality of the illustrative issues list within the current regulatory framework.
 
 
 40
 (b) The inadequacy of the issues list in making a prima facie case. As noted, to make a prima facie case a petitioner to deny must file affidavits alleging specific facts which, if established, would show that the "overall" programming efforts of the applicant failed to include adequate treatment of those issues of public concern chosen by the applicant itself. But if the petitioner were to base its challenge solely on the FCC's revised issues list, any licensee would be free to respond by stating that conclusions drawn on the basis of admittedly "illustrative" lists do not have a substantial bearing on the applicant's overall programming efforts. The licensee could argue that the petitioner lacks the complete picture and therefore has failed to evaluate fairly the licensee's programming. The petitioner would be unable to dispute that claim. Lacking a disputed material issue, the Commission would dismiss the petition.
 
 
 41
 Both respondents and intervenors mischaracterize this problem. They stress that the Commission has now adopted a qualitative approach to the issue of community-responsive programming. They suggest that given the qualitative focus of the FCC's new approach in this area the issues/programs list is perfectly adequate for all relevant purposes. See brief for respondents at 16 n. 11; joint brief for intervenors CBS, Inc. et al. at 21-22.
 
 
 42
 We agree that the Commission has adopted an approach to the question of community-responsive programming that emphasizes the quality of a broadcaster's efforts, not the quantity of its nonentertainment programming. A petitioner must amass sufficient facts to put the overall quality of a licensee's broadcasting into dispute. A merely illustrative list is not up to that task. It is simply impossible to determine whether the inadequate treatment of the issues on a merely illustrative list fairly reflects on the quality of a broadcaster's overall efforts.
 
 B. The Rejection of Reasonable Alternatives
 
 43
 1. The "issues log" alternative. In UCC III, 707 F.2d at 1440, this court suggested that the Commission should determine "whether a revised comprehensive logging requirement--one designed, for example, to log information about issues and not categories of programming--might not produce benefits that would outweigh the recordkeeping costs" (emphasis in original). Petitioner criticizes the FCC for rejecting that alternative. See brief for petitioner at 17 n. 8, 28.[13]
 
 
 44
 On remand the Commission explicitly considered this option, prominently featuring it in the Further Notice of Proposed Rulemaking as the agency's tentative favorite. See JA 4. The Commission rejected this option only after receiving numerous comments from broadcasters, see, e.g., JA 43, 53-55, 74, indicating that an issues log, unlike a category log, would be quite expensive to produce because it would require the involvement of managerial personnel. See Second Report, 96 FCC2d at 939 para. 22, JA 16.
 
 
 45
 In the past this court has not second-guessed this type of cost-benefit analysis. See, e.g., UCC III, 707 F.2d at 1440. We will not do so here. Satisfied that the agency has rationally considered the costs and benefits of an "issues log" and that the agency has adequately explained the basis for its action, we do not find its rejection of that alternative to be arbitrary and capricious.[14]
 
 
 46
 2. The "significant treatment" alternative. We do not take such a sanguine view, however, of the agency's treatment of the "significant treatment" alternative. During the notice and comment period following our remand at least one commentator suggested that the agency require licensees to list the programs that had provided "significant treatment" of community issues during the relevant time period. See Comments of ABC, Inc., JA 46-47. Under this proposal a petitioner to deny would not rely solely on a merely illustrative list. Instead, the petitioner would rely on a list that the broadcaster itself had certified to include those programs in which the broadcaster had provided "significant treatment" of issues of community concern.
 
 
 47
 The relative benefits of such a list are obvious. By referring to this list a petitioner to deny would be able to determine whether a broadcaster had provided significant coverage of some set of issues of community concern. The petitioner would be able to assert that by the broadcaster's own admission the programs on this list represented the most significant treatment by that broadcaster of issues that the broadcaster itself thought to be of community concern. If the petitioner could submit affidavits explaining why such programs failed to meet the most minimum qualitative standards, serious doubt would be cast on the overall adequacy of the broadcaster's programming. For if the broadcaster's best programs (i.e., its listed programs) were inadequate, it is questionable whether the broadcaster's unlisted programming would pass muster. Although the Commission would retain substantial discretion in each case to evaluate the probative value of such a showing, common sense suggests that a petitioner to deny would usually come quite close to showing that such a record made renewal of a license prima facie inconsistent with the public interest.
 
 
 48
 The Commission suggests that its current program will in fact produce this result even though its regulations merely require an exemplary list. Thus the Second Report reasons: "[W]e anticipate that broadcasters will probably use them to adequately document their significant issue-responsive programming, because doing so will serve their own self interest." 96 FCC2d at 940 para. 24, JA 17. The Commission may be right. Unfortunately, it has provided no explanation of what sustains its hopeful outlook.[15] Moreover, as we have noted on a previous occasion, in reviewing the Commission's public file regulations we are primarily concerned with the minimum requirements imposed by regulation, not with what the Commission hopes private parties will do if left free from such requirements.[16]
 
 
 49
 On the other side of the ledger, it is far from clear that the costs of such a list are self-evidently prohibitive. At least nothing in the Second Order suggests that conclusion. Although this proposal would entail some use of managerial personnel, and consequently would entail some increase in costs, such costs would not be as substantial as those entailed by a daily issues log. Indeed it is not clear that this proposal would entail any marginal costs over those already mandated by the illustrative issues/programs list. Of course, we are not equipped to assess the relative costs of this proposal as an initial matter. We only raise such questions to illustrate the sort of analysis the agency should have provided when it rejected the "significant treatment" alternative.
 
 
 50
 This court does not insist that the agency consider every conceivable option. Motor Vehicle Manufacturers Ass'n v. State Farm Mutual Auto. Ins. Co., supra, 463 U.S. at 51, 103 S.Ct. at 2871. But the "significant treatment" option would seem tailor-made to the agency's new "qualitative" standard for evaluating petitions to deny. The Commission's failure to provide a single word of explanation for its rejection of an option that appears to serve precisely the agency's purported goals suggests a lapse of rational decisionmaking.
 
 IV. CONCLUSION
 
 51
 The FCC has stated that it now primarily relies on petitions to deny in enforcing the statutorily mandated public interest requirement of the Communications Act. Yet the Commission's revised issues list fails to provide an adequate basis for a prima facie showing in a petition to deny. This court has repeatedly noted that its approval of the FCC's deregulation of the license renewal process hinges, in part, on the development of adequate recordkeeping requirements by the Commission. Because the Commission's new recordkeeping requirements fail to advance the Commission's own purported goals in a rational manner, and because the Commission has failed to explain adequately its rejection of one of the most serious options before it, the order of the Commission must be vacated. The case is remanded so that the agency may reconsider the specified alternative or develop another adequate means of assuring petitioners to deny the basis for stating a prima facie case.
 
 
 52
 Vacated and remanded.
 
 
 
 [1]
 In a related case, Nat'l Black Media Coalition v. FCC, 706 F.2d 1224 (D.C.Cir.1983), this court approved the decision of the FCC to exempt small radio and television licensees from the requirement of conducting formal surveys to ascertain the needs and interests of the community they served
 
 
 [2]
 See also Buckeye Cablevision, Inc. v. United States, 438 F.2d 948, 951 (6th Cir.1971) (Sec. 405 satisfied where issue raised by another party); New York State Broadcasters Ass'n v. United States, 414 F.2d 990, 994 (2d Cir.1969), cert. denied, 396 U.S. 1061, 90 S.Ct. 752, 24 L.Ed.2d 755 (1970) (same)
 
 
 [3]
 See S.Rep. No. 44, 82d Cong., 1st Sess. 13 (1951); H.R.Rep. No. 1750, 82d Cong., 2d Sess. 18 (1952)
 
 
 [4]
 Both attack the adequacy of the issues list for the purposes of building a prima facie case in the context of a petition to deny a license. Compare Comments of Henry Geller & Donna Lampert, JA at 81, with brief for petitioner at 17-18. Both call on the FCC to require recording of all nonentertainment programming as opposed to merely issue-responsive programming. Compare Comments of Geller & Lampert, JA at 83, with brief for petitioner at 23-26
 
 
 [5]
 We also note that there was some confusion in this case as to whether the Commission had actually initiated a new proceeding on remand or merely continued the same "radio deregulation proceeding" given that the Commission kept the same docket number on remand. Further Notice, 48 Fed.Reg. 33499 (July 19, 1983) at paras. 1, 7, JA 1, 4. This argument provides an alternative rationale supporting our conclusion that petitioner may press its arguments before this court
 
 
 [6]
 47 U.S.C. Sec. 303(j) (1982) reads in pertinent part: "[The FCC has the authority] to make general rules and regulations requiring stations to keep such records of programs * * * as it may deem desirable" (emphasis added). Moreover, the Conference Committee specifically rejected the mandatory log requirement contained in the Senate bill. See H.R.Conf.Rep. No. 1886, 69th Cong., 2d Sess. 3 (1927); 68 Cong.Rec. 2564 (1927) (remarks of Rep. Scott)
 
 
 [7]
 In issuing its order in this case the Commission appeared to deemphasize the importance of the petition to deny. See Second Report, 96 FCC2d at 940-941 para. 26, JA 17-18. We do not understand the Commission to suggest that this court reconsider its prior decisions upholding the FCC's deregulation of the license renewal process. Nor does the Commission contest the fact that our prior decision was predicated, in part, on the ability of the petitioner to deny to participate in the license renewal process. See Black Citizens For A Fair Media v. FCC, 719 F.2d 407, 414 (D.C.Cir.1983), cert. denied, --- U.S. ----, 104 S.Ct. 3545, 82 L.Ed.2d 848 (1984). Therefore, absent a more elaborate explanation by the Commission, we must discount such newfound second thoughts on the importance of the petition to deny procedure. Instead, we reaffirm our view in UCC III that the Commission places "near-total reliance on petitions to deny as the means to identify licensees that are not fulfilling their public interest obligations." 707 F.2d at 1441
 
 
 [8]
 In this context we note that the Commission's discovery procedures are not available to a petitioner to deny at the point at which he is attempting to make a prima facie case. 47 C.F.R. Sec. 1.311(a) (1984) specifically provides that the Commission's discovery procedures are only available "in any case of adjudication * * * which has been designated for hearing." Section 309(d), however, prevents the FCC from designating issues for a hearing until the petitioner to deny has already made a prima facie case and the Commission has determined, after considering the applicant's counter-affidavits, that there is a "substantial and material" dispute concerning the adequacy of the applicant's programming. 47 U.S.C. Sec. 309(d)(2). Intervenors' observation that such discovery procedures might obviate any problems presented by the issues/programs list in the context of a comparative renewal hearing, see joint brief for intervenors CBS, Inc., Nat'l Ass'n of Broadcasters, and Nat'l Radio Broadcasters Ass'n at 24-25, therefore does not apply to the problems presented by such lists in the course of a petition to deny under 47 U.S.C. Sec. 309(d)
 
 
 [9]
 Even if the Commission had statutory authority to implement such a policy, it likely would not survive review under the Administrative Procedure Act. The Commission's suggestion amounts to a policy of encouraging frivolous petitions. The petitioner would have little to lose by filing a petition first and hoping that the Commission would come to the rescue with a generous use of its factfinding power. This policy could only result in vexing licensees, the Commission, and this court. Such a policy would plausibly be open to charges of irrationality
 
 
 [10]
 The Commission also suggests that if such monitoring proves burdensome it may "revisit" this issue. This court has already addressed the burdensome character of such a procedure. See UCC III, 707 F.2d at 1441. So has the Commission. Maintenance of Program Records, 44 FCC2d 845, 852 (1974). Until and unless the agency presents us with a new analysis, explaining why its previous factual determinations were unfounded, we see little reason to reject those findings
 
 
 [11]
 It should be noted that the "provisions" through which Congress sought to effect its new policy included both the prima facie case requirements of Sec. 309(d)(1) and the hearing requirements of Sec. 309(d)(2). See H.R.Rep. No. 1800, 86th Cong., 2d Sess. (1960). Thus even though the Commission's ability to deny a hearing is somewhat independent of its definition of a prima facie case, and even though Congress was primarily concerned with the "liberality" with which the Commission had granted hearings, the restraining influence of the 1960 amendments plainly applies to the prima facie case requirement as well
 
 
 [12]
 Of course, should the Commission decide that public participation is no longer an important element in the license renewal process, this standard would no longer apply. Our statement of the current standard for making a prima facie case simply results from our assumption that the Commission cannot adopt means that undercut its own purported goals. Our conclusion here does not run afoul of this court's long-standing view that "Congress intended to vest in the FCC a large discretion to avoid time-consuming hearings in this field whenever possible." Southwestern Operating Co. v. FCC, 351 F.2d 834, 835 (D.C.Cir.1965). To the extent that we suggest that the Commission's discretion is limited we refer only to its discretion to make it easier to obtain a hearing, not harder
 
 
 [13]
 In UCC III this court upheld the shift in focus from nonentertainment programming to issue-responsive programming. See 707 F.2d at 1430. Issue-responsive programming was defined as programming involving a "point of discussion, debate or dispute" or a "matter of wide public concern." See Memorandum Opinion and Order, 87 FCC2d 797, 818 (1981). Petitioner argues that the Commission has redefined "issue-responsive" programming so that the agency's shift of focus is now much more substantial than this court had assumed in UCC III. We disagree. The definition of issue-responsive programming in the Second Report fairly tracks the definition reviewed by this court in UCC III. Compare First Reconsideration Order, 87 FCC2d 797, 818 (1981) (the term "issue" is not limited to points of controversy but rather encompasses any "point of discussion, debate, or dispute or [any] matter of wide public concern") and First Report, 84 FCC2d at 999, with Second Report, 96 FCC2d at 938 para. 19, JA 15
 
 
 [14]
 Similarly, we find the Commission rationally rejected the comprehensive "nonentertainment log" proposal put forward by Geller and Lampert during the proceedings before the agency, see JA 83-86, and advocated by petitioner in this appeal. See brief for petitioner at 23-26. In UCC III we upheld the agency's shift from categorical to issue-oriented programming. See 707 F.2d at 1430. We therefore approved of the FCC's general shift from categorical logs to issue-oriented lists. See id. at 1440. We see no reason to reverse that conclusion now
 
 
 [15]
 There is no doubt that some stations might decide to keep shoddy lists and take their chances. We simply do not know how many stations are likely to follow this course. At oral argument it was suggested by counsel for intervenor CBS, Inc. that most responsible stations would keep such lists. But it is certainly plausible that many small stations might decide to keep poor lists. The discounted value of losing their license might be so low that it would not warrant the near-term costs entailed by first-rate listmaking
 Counsel for intervenor CBS, Inc. suggested, in the alternative, that if the majority of broadcasters decided not to keep de facto "significant treatment" lists, the Commission ought not impose such additional costs on all broadcasters when only a few would likely fail to provide adequate community-responsive programming. On remand, the Commission is of course free to pursue this line of reasoning. But if it does so we assume it will fully explain why its Second Order inaccurately predicted that broadcasters would respond to the illustrative issues list by keeping a de facto "significant treatment" list.
 
 
 [16]
 See brief for petitioner at 15 n. 6, quoting Transcript of Oral Argument, May 24, 1982, at 36-37, in UCC III (Wright, J., noting that the public file rules involve "not a question of incentive but a question of requirements")